Receipt number 9998-4529226

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FILED**

Mar 7 2018

U.S. COURT OF
FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. __18-359 L__ |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

Frances C. Bassett, Attorney of Record
Thomas W. Fredericks, of Counsel
Jeremy J. Patterson, of Counsel
Joanne Harmon Curry, of Counsel
Michael D. Oeser, of Counsel
Michael W. Holditch, of Counsel
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 673-9600
Email: fbassett@ndnlaw.com

Rollie E. Wilson, of Counsel
FREDERICKS PEEBLES & MORGAN LLP
401 9th St., N.W., Suite 700
Washington, DC 20004

March 7, 2018

# TABLE OF CONTENTS

I.   GENERAL NATURE OF THE ACTION ............................................................. 1

II.  PARTIES ......................................................................................................... 1

III. JURISDICTION AND VENUE ....................................................................... 2

IV.  TIMELINESS OF THE PLAINTIFF'S ACTION ............................................. 5

V.   STATEMENT OF FACTS ............................................................................... 6

  A. HISTORY OF THE UTE TRIBE AND ITS RESERVATION ........................... 6

  B. THE UTE TRIBE'S WATER RIGHTS AND RELATED RIGHTS AND RESOURCES . 8

    i.   The Act of March 1, 1899 ....................................................................... 8

    ii.  The 1906 Act and Related Acts Authorizing and Funding the Uintah Indian Irrigation Project ................................................................................. 8

    iii. The Tribe's *Winters* Reserved Water Rights ........................................... 10

    iv.  1923 Ute Indian Tribe's Federally-Decreed Reserved Water Rights ........... 11

    v.   The Decker Report .............................................................................. 13

  C. DUTY AND RIGHTS CREATING SOURCES OF LAW GIVING THE UNITED STATES PERVASIVE, COMPREHENSIVE, AND EXCLUSIVE CONTROL OVER THE ESTABLISHMENT, MANAGEMENT, AND DEVELOPMENT OF UTE WATER RIGHTS, ASSETS, AND RESOURCES .............................................. 14

  D. THE FEDERAL GOVERNMENT'S LOSSES OF, FAILURES TO PROCURE AND PROTECT, TRANSFERS OF, CONVERSIONS OF, AND WASTE AND MISMANAGEMENT OF THE UTE TRIBE'S WATER, WATER WORKS AND RELATED RIGHTS .............................................................................. 15

      i. Mismanagement of the UIIP and its Related Water Rights ....................... 15

    a. Development and Construction of the Uintah Indian Irrigation Project ......... 15

    b.  Failure to Provide Storage ................................................................... 18

    c.  Unlawful Secretarial Transfers of Water Rights ...................................... 21

    d.  Deferred Maintenance of the UIIP ........................................................ 24

e.   Designation of UIIP Lands as Temporarily or Permanently Non-Assessable ............... 29

f.   Midview Exchange Agreement ........................................................................ 30

ii.  Unlawful Action/Inaction by the United States Relating to the 1965 Deferral Agreement ................................................................................................................. 35

iii.  The Central Utah Project Completion Act of 1992 and the Promise of Uinta Basin Replacement Facilities ........................................................................................ 42

a.   Unjust Compensation for Waiver of Claims .................................................. 42

b.   Uintah Basin Replacement Projects .............................................................. 46

VI.   STATEMENT OF CLAIMS ............................................................................... 49

FIRST CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Mismanagement of Tribal Statutory and Reserved Water Rights to Irrigate Uintah Indian Irrigation Project Lands and for Other Purposes) ......................................................... 49

SECOND CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Construct Storage for the Tribe's Federally-Decreed Reserved Water Rights) ........................................................................................................................ 50

THIRD CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Protect, Maintain, Repair, Rehabilitate, Construct, and Preserve the Uintah Indian Irrigation Project) ........................................................................................ 52

FOURTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Non-Assessable Lands in the UIIP) ........................................................... 54

FIFTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties – Unlawful Transfers of Tribal Water Rights under the 1941 Act) ............................ 55

SIXTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Midview Exchange) ................................................................................ 57

SEVENTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Midview Exchange – Failure to Discontinue Inequitable Water Management Framework) ........................................................................................................ 58

EIGHTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Develop Tribal Water Rights) .................................................... 60

NINTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Enforce and Protect the Tribe's Right to Just Compensation in the 1992 CUPCA) ........................................................................................................... 61

TENTH CLAIM FOR RELIEF (Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Provide Tribal Water Storage as Part of the Uintah Basin Replacement Projects) .................................................................................................................... 62

ELEVENTH CLAIM FOR RELIEF (Breach of Trust and Fiduciary Duties: Bottle Hollow Reservoir)................................................................................................................................ 63

TWELFTH CLAIM FOR RELIEF (Breach of Trust and Fiduciary Duties: Systematic Management and Administration of Tribal Water Rights and Water Resources in Violation of Defendant's Fiduciary Duty of Undivided Loyalty)................................................................. 65

THIRTEENTH CLAIM FOR RELIEF (Unconstitutional Taking of Tribal Assets: Midview Exchange) ............................................................................................................................... 66

FOURTEENTH CLAIM FOR RELIEF (Unconstitutional Taking of Tribal Assets: Central Utah Project Completion Act) ............................................................................................... 67

FIFTEENTH CLAIM FOR RELIEF (Breach of Contract: 1965 Deferral Agreement)........... 69

SIXTEENTH CLAIM FOR RELIEF (Breach of Contract: Midview Exchange).................... 70

Plaintiff, UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION ("UTE TRIBE" or "TRIBE"), for its Complaint against Defendant, the UNITED STATES, alleges as follows:

## I.       GENERAL NATURE OF THE ACTION

1.       This is an action by the Plaintiff Ute Indian Tribe against the Defendant United States for the United States' breach of its common law, constitutional, statutory, regulatory and fiduciary trust duties to the Tribe, and for the unconstitutional taking of tribal property.  This action arises out of the United States' mismanagement and illegal taking of tribal trust assets in the form of Indian reserved water rights, including federally-decreed reserved water rights, and the water resources, water works, and trust funds related to these assets.  The Tribe's losses and damages are due, *inter alia*, to Defendant's failures in its exercise of statutory and fiduciary obligations to protect, preserve, administer, supervise, control, and manage these trust assets under applicable legal duties, duties that at all times pertinent have been and continue to be under the pervasive, comprehensive, and exclusive custody, control, and prerogative of the United States.  The Tribe brings this action to obtain compensation and other relief for the damage and losses resulting from the claims asserted.

## II.       PARTIES

2.       Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation is a federally recognized, sovereign Indian Tribe, organized with a Constitution approved by the Secretary of the Interior under the Indian Reorganization Act of 1934, 25 U.S.C. § 5101 *et seq.*, 82 Fed. Reg. 4919 (Jan. 17, 2017).  The Constitution establishes, among other things, that the Ute Tribal Business Committee is the Tribe's governing body.  The Tribe is comprised of three bands of Ute Indians, the Uintah, Whiteriver, and Uncompahgre Bands, who today occupy the Uintah and Ouray

Indian Reservation in the Green River Basin of northeastern Utah, where the Tribe owns beneficial interests in land, water, various water works, and related funds.  The Reservation is located within a portion of the Tribe's aboriginal lands and encompasses just over four million acres.  The Tribe brings this cause of action on its own behalf and as *parens patriae* on behalf of its tribal members in order to protect its members' health, welfare, and economic security and well-being.

3.     Defendant, the United States, is a sovereign government, the agencies of which include the United States Department of the Interior and the Bureau of Indian Affairs ("BIA") and the Indian Service, which as relevant to this suit, was a predecessor to the BIA.  The United States holds legal title as trustee to the Tribe's trust lands, waters, water works, and trust funds relating to these assets.  The Tribe and its members are the beneficial owners of these assets.  Defendant is vested with numerous trust, fiduciary, and other legal duties owed to the Tribe and its members under various treaties, executive orders, Congressional acts, federal regulations, judicial decrees, and express and implied contracts.

### III.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under 28 U.S.C. § 1491(a)(1) ("Tucker Act") because this is a civil action against the United States for money damages arising under the Constitution, laws, treaties, and regulations of the United States, or upon express or implied contracts with the United States.

5.     Additionally, the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1505 ("Indian Tucker Act") which waives sovereign immunity in suits by Indian tribes residing within the territorial limits of the United States arising under the Constitution, laws, treaties, or regulations of the United States, and/or is one which would otherwise be cognizable in this Court if the claimant were not an Indian tribe, band, or group.

6.     This is a matter arising under the United States' trust responsibility over Indians and Indian Tribes, as established and defined under federal law.  This matter also arises under the Constitution and various law and treaties of the United States, including, without limitation:

a.   The Treaty of Guadalupe Hidalgo in 1848;

b.   Exec. Order of Oct. 3, 1861, 1 Kapp. 900 (2d ed. 1904);

c.   Act of May 5, 1864, ch, 77, § 2.

d.   Act of June 15, 1880, ch. 223, 21 Stat. 1999.

e.   Exec. Order of Jan. 5, 1882, 1 Kapp. 901 (2d ed. 1904);

f.   The Act of February 8, 1887, 25 U.S.C. §§ 381 *et seq.*;

g.   Act of March 1, 1899, 30 Stat. 941

h.   The Reclamation Act of 1902, Pub. L. 57-161, ch. 1093, 32 Stat. 388;

i.   The Act of June 19, 1902, 32 Stat. 744;

j.   Act of March 3, 1905 (33 Stat. 1048, amended May 14, 1920 (33 Stat. 1069-1070, c. 1479; 41 Stat. 599-600, c. 187);

k.   The Department of Appropriation Act of June 21, 1906, Pub. L. 59-258, Stat. 325, 375;

l.   *Winters v. United States*, 207 U.S. 564 (1908) and its progeny;

m.   The Department of Appropriation Act of March 3, 35 Stat. 811 (1909);

n.   The *Cedarview Irrigation Company*, no. 4427, slip op. (D. Utah 1923) and *Dry Gulch Irrigation Company*, No. 4418, slip op. (D. Utah 1923) ("1923 Decrees");

o.   Act of July 1, 1932 (47 Stat. 564);

p.   The Historic Sites, Buildings, and Antiquities Act of 1935, 16 U.S.C. §462

q.    The Leavitt Act, Act of June 22, 1936, ch. 692, § 3 1804, 49 Stat. 1183, 25 U.S.C. §§ 389, 389a-e.

r.    The March 4, 1943, Agreement between the United States and Dewey McConkie, and other similar Agreements;

s.    Colorado River Storage Project Act of April 11, 1956, P.L. 485, 70 Stat. 105, 43 U.S.C. §§ 620 *et seq.*, as amended.

t.    25 U.S.C. § 177;

u.    25 C.F.R §§ 126.1 *et seq.*;

v.    Partial Payment Construction Charges on Indian Irrigation Projects Regulations, 25 C.F.R. § 134.4a;

w.    Federal regulations governing the BIA's operation and maintenance of the Project, 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957);

x.    The Irrigation Operation and Maintenance Regulations, 25 C.F.R. Part 171;

y.    Operational Practices on the Uintah Indian Irrigation Project Not Specifically Set Forth in Agreements;

z.    The Interest and Penalty on Claims, 31 U.S.C § 3717;

aa.    The BIA National Irrigation Handbook;

bb.    The Reclamation Projects Authorization and Adjustments Act of 1992, Pub. L. 102-575, 106 Stat. 4600.

cc.    The Equal Protection and Due Process clauses of the United States Constitution.

7.    Venue lies in this Court pursuant to 28 U.S.C. §§ 1505 and 1491(a)(1).

## IV.     TIMELINESS OF THE PLAINTIFF'S ACTION

8.      The Tribe filed a Complaint against the United States in 2006, alleging that the United States had breached its trust responsibility to the Tribe by mismanaging its monetary and non-monetary trust assets, including tribal natural resources, as well as by failing to provide an accounting for these trust assets. Complaint, *Ute Indian Tribe of the Uintah & Ouray Reservation v. United States*, No. 06-866L (Ct. Fed. Cl. 2006).

9.      On March 8, 2012, the parties entered into a Settlement Agreement ("2012 Settlement Agreement") which released the Tribe's claims against the United States, except for certain claims that were specifically preserved under the Settlement Agreement.

10.      The Settlement Agreement specifically preserved claims for damages relating to the United States' mismanagement of the Tribe's water rights, stating:

> [N]othing in this Settlement Agreement shall diminish or otherwise affect in any way:
>
> a.   Plaintiff's ability, subject to the provisions of Paragraph 13 below, to assert a claim for harms or damages allegedly caused by Defendant after the date of execution of this Settlement Agreement;
>
> b.   Plaintiff's water rights, whether adjudicated or unadjudicated; Plaintiff's authority to use and protect such water rights; and Plaintiff's claims for damages for loss of water resources allegedly caused by Defendants' failure to establish, acquire, enforce, or protect such water rights…

11.      The present action is timely because it is filed within six years of the 2012 Settlement Agreement, preserving the Tribe's right to bring claims for damages against the United States for, *inter alia*, its mismanagement of the Tribe's water rights.

12.      The present action is otherwise timely because Plaintiff's claims have accrued within the applicable six-year statute of limitations pursuant to 28 U.S.C. § 2501.

13.      The present action is otherwise timely because of the continuing nature of the Defendant's violations of law set forth herein.

## V.   STATEMENT OF FACTS

### A.  HISTORY OF THE UTE TRIBE AND ITS RESERVATION

14.     Utah is the second most arid State in the country.  Because there is little rainfall over the summer, the only viable source of water is winter snowmelt and the ability to store it.  In testimony before a Senate Committee in 1990, Utah Senator Jake Garn described Utah's exceptionally arid conditions, explaining:

> Even with summer droughts, there is sufficient snow melt to carry even today's and future population if we have the ability to store it through the summer months. [This] is a concept that I have to continue to try to get over to my colleagues of winter snowfall, summer drought, and the need to be able to store that [winter snowmelt].

15.     The critical need for year-round water applies with equal force to the Ute Tribe.  In 1905, the Commissioner of Indian Affairs, in his annual report, described the conditions on the Tribe's reservation:

> The future of these [Ute] Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate.

Rept. of the Comm. of Ind. Aff., 1906.

16.     The Ute Indians once "ranged from the Wasatch Front all the way to the Colorado Front Range—from present-day Salt Lake City to Denver." CHARLES WILKINSON, FIRE ON THE PLATEAU, CONFLICT AND ENDURANCE IN THE AMERICAN SOUTHWEST, 128 (1999).  The Ute Tribe of the Uintah and Ouray Reservation is comprised of three bands of the greater Ute Tribe, the Uintah band (indigenous to Utah), the Whiteriver band (removed from Colorado to the Uintah Valley Reservation) and the Uncompahgre band (removed from Colorado and settled east of the Green River on the Uncompahgre Reservation).

17.    The United States has had a fiduciary relationship with the Ute Indians since the Tribe's aboriginal lands were ceded to the United States by Mexico under the 1848 Treaty of Guadalupe Hidalgo.  *See Ute Indian v. United States*, 45 Ct. Cl. 440, 442-3 (Ct. Cl. 1910).

18.    The present-day Uintah and Ouray Reservation is comprised of two separate Indian reservations (hereinafter referred to collectively as "the Reservation").  The first reservation, the Uintah Valley Reservation, was established by Executive Order on October 3, 1861, confirmed by Congress in the Act of May 5, 1864, § 2, 13 Stat. 63, and encompassed 2,039,040 acres in the Uinta Basin of Utah.  Under the 1861 Executive Order, the Uintah Valley Reservation included "the entire valley of the Uintah River within Utah territory, extending on both sides of the river to the crest of the first range of contiguous mountains on each side"

19.    The second reservation, the Uncompahgre Reservation, was established pursuant to the Act of June 15, 1880 (ch. 223, 21 Stat. 1999), and the Executive Order of January 5, 1882, and it encompassed approximately 2,000,000 acres.

20.    Numerous Executive and Congressional actions have reduced the overall size of lands reserved and held in trust by the United States for the Tribe.

21.    The Reservation is located in the Green River Basin in the northeast corner of Utah at the foot of the Uinta Mountains, on an arid and sparsely settled plateau.  All of the Reservation lies within the drainage of the Colorado River Basin and a multitude of streams flows through the Reservation; the Duchesne River and its tributaries, Rock Creek, Lake Fork River, Yellowstone River, Uinta River, and Whiterocks River are among the rivers that pass south from the Uinta Mountains through the western part of the Reservation to the Green River, which, together with its tributaries, including the White River, flows through the eastern part of the Reservation and then on to the mainstem of the Colorado River.

22.     The Reservation was established for the purpose of providing a permanent homeland for the Ute Tribe and its members, and for the purpose of making agricultural improvements to enable the Indians to become self-sustaining by means of agriculture.

## B. THE UTE TRIBE'S WATER RIGHTS AND RELATED RIGHTS AND RESOURCES

### i.   The Act of March 1, 1899

23.     In 1899, the United States Congress passed a law confirming that Indians living on the Uintah Indian Reservation have the "paramount rights" to the waters of the streams of the Reservation as currently used or needed by them in the future for "agricultural and domestic purposes."  The Act of March 1, 1899, 30 Stat. 941 ("1899 Act").

24.     The 1899 Act also established that

> … it shall be the duty of the Secretary of the Interior to prescribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed for their present and prospective wants, and to otherwise protect the rights and interests of the Indians and the Indian service.

### ii.   The 1906 Act and Related Acts Authorizing and Funding the Uintah Indian Irrigation Project

25.     The United States Congress subsequently acknowledged the duties and responsibility vested in the Federal Government under the 1899 Act by enacting legislation in 1906 for the construction of irrigation systems to irrigate the lands of the Ute Indians, because, as the Hon. Joseph Howell of Utah, House of Representatives, stated in support of the legislation, "it is the solemn duty of the Government, in its role of guardian of the Indians, to relieve the situation[,]" and secure a water supply, "because [w]ithout water these lands are like those in any other portions of the West, which is to say, of little value; with water, however, they will yield rich returns . . . ." Although the Ute Indians were entitled to the confirmation of their water rights to conserve and protect approximately 6,000 acres of land under cultivation in 1905, pursuant to the Act of March

3, 1905, no confirmation was made, but, instead, the acting Indian agent for the Government filed application for appropriation with the Utah State Engineer in accordance with the laws of the State of Utah.

26.     The Act of June 21, 1906, provides that the Secretary of Interior shall hold title to the Tribe's water rights and the Ute Indian Irrigation Project (hereinafter "UIIP" or "Project"), in trust for the Indians, and that the Secretary may sue and be sued in matters relating thereto.

27.     At the time the 1906 Act was passed by Congress, 103,265 acres had been allotted to the Indians in severalty.  Although the United States was to grant allotments to the Ute Indians that provided irrigable lands for agricultural pursuits, subsequent reports by the Federal Government confirm that many Ute Indians were not allotted lands that could be irrigated.  In fact, a survey and investigation of irrigation on the Reservation in the late 1920s concluded that "the Indians were actually allotted some of the most worthless land on the reservation, while some of the very best land was opened to entry and has since been homesteaded [by non-Indians]."  As recounted, *inter alia*, in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 521 F. Supp. 1072, 1126-27 (D. Utah 1981), the United States acted to insure that the desires of  non-Indians on the Reservation and/or non-Indian irrigators under the UIIP were given precedence, thereby violating the United States' fiduciary obligations to the Ute Tribe and its members.

28.     In the years following the 1906 Act, Congressional appropriations were made specifically for the development and construction of the UIIP.  In 1909, Congress appropriated funds for constructing the irrigation system "to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah, as provided by the [1906 Act]."

29.     In 1914, reporting to the Congressional Committee on Indian Affairs, the Secretary of the Interior also acknowledged the solemn duty of the Government under the principles laid

down in the Act of 1899 to enforce and protect the Indian rights to water for their irrigation systems.

30.     No Act of Congress or judicial ruling has abrogated the trust status of the Tribe's water rights or the duties imposed upon the United States under the 1899 and 1906 Acts to preserve and protect the "paramount" right of the Tribe and its members to waters from the rivers and streams running through its Reservation in an amount sufficient to meet current and future needs and to establish a permanent homeland.

### iii.     The Tribe's *Winters* Reserved Water Rights

31.     In 1908, the United States Supreme Court ruled that when the United States establishes an Indian reservation, it impliedly reserves the amount of water necessary to fulfill the purpose of the reservation.  *Winters v. United States*, 207 U.S. 564 (1908) (now known as the "Winters Doctrine").  The water rights reserved to the Tribe upon the establishment of the Uintah Valley and Uncompahgre Reservations are referred to hereafter as "*Winters* reserved water rights," or simply "Reserved Water Rights."

32.     *Winters* reserved water rights create a senior priority use to the water dating back to the creation of the reservation.  Further, the United States Supreme Court has ruled that *Winters* reserved water rights are "present perfected water rights" which vest at the time the reservation is established.  *Arizona v. California*, 373 U.S. 546, 600 (1963).

33.     Pursuant to the *Winters* Doctrine, the amount of water that is necessary to fulfill the purpose of the reservation is impliedly reserved.  In the case of the Ute Tribe, the Tribe's *Winters* reserved water rights encompass the entire amount of water necessary to sustain a permanent homeland on the Uintah and Ouray Reservation.  Although the Reservation's purpose is relevant to the quantity of waters impliedly reserved, *Winters* reserved water rights are not limited in use

to irrigation or any other specific purpose.  *Arizona v. California*, 439 U.S. 419, 421 (1979);
*Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981).

34.     *Winters* reserved water rights, established with the creation of the reservation and
prior to the allotment of land to individual Indians, are trust assets held by the United States in
trust for the benefit of Indian tribe on particular reservations.

35.     With the establishment of the 1908 Winters Doctrine, the United States Supreme
Court altered the previous understanding that Indian water rights had to be obtained in compliance
with the state law of the particular state in which a particular Indian reservation was located.  It is
now beyond cavil that Winters Reserved Water Rights are not subject to the laws of the State of
Utah, but are governed by federal laws.

36.     As explained by the Secretary of the Interior to the Committee on Indian Affairs in
his 1914 report to Congress, the principles laid down in *Winters* are those more specifically
provided for in the Act of March 1, 1899, and require the Government to enforce, protect, and
preserve the Ute Tribe's senior-priority rights to water.

37.     The 1922 Colorado River Compact acknowledged the rights of Indian tribes with
Reserved Water Rights in the Colorado River, including the water rights of the Ute Indian Tribe,
and provided that these tribal rights shall not be adversely affected by the multi-state compact
providing for the apportionment of the Colorado River among the Upper and Lower Colorado
River Basins.

           **iv.     1923 Ute Indian Tribe's Federally-Decreed Reserved Water
                     Rights**

38.     In 1916, as conflicts mounted between the Ute Indians and their non-Indian
neighbors over water allocations in the Lakefork, Yellowstone, Uinta, and Whiterocks Rivers, the
United States filed suit in federal district court to protect the Ute Tribe's water rights.  *United*

*States v. Cedarview Irrigation Co.,* No. 4427 (D. Utah 1923); *United States v. Dry Gulch Irrigation Co.,* No. 4418 (D. Utah 1923). The federal district court established the apportionment and priority of the Tribe's Reserved Water Rights under the Uintah Indian Irrigation Project within the Colorado River Basin for the Uinta-Whiterocks River sub-basin and the Lake Fork-Yellowstone River sub-basin, and prohibited non-Indian irrigators from interfering with Tribe's Reserved Water Rights designated for distribution to the lands of the Uintah Indian Irrigation Project.

39. The court issued two federal decrees affirming Tribe's Reserved Water Rights for irrigation of 59,771.69 acres of tribal lands within the UIIP, with a total irrigation diversion duty of 3.0 acre-feet per year per acre. The court assigned a period of use from March 1 to November 1 annually. The decrees also awarded the Tribe year-round water diversions for domestic, culinary, and stock watering uses.

40. In each of the two decrees, the federal district court concluded that the Tribe has "the first and an exclusive right under a priority date that antedates the third day of October, 1861" to divert waters from the subject Rivers. In confirming a priority date for the use of the water that antedates October 3, 1861, the court acknowledged that the Tribe's adjudicated water rights are not subject to state-based water law, but are federal *Winters* reserved water rights, subsequently acknowledged and recognized by the Department of Interior. The United States has failed to manage, administer, and use the Tribe's water rights as federally Reserved Water Rights in the exercise of its duty to preserve, protect, and develop these water rights. This has created continuing problems and has prevented the United States from fulfilling its fiduciary duties as the trustee of the Tribe's federal Reserved Water Rights.

### v. The Decker Report

41.     In 1960, E.L. Decker, employed by the Tribe, surveyed the lands of the Uintah and Ouray Reservation and produced a report quantifying the irrigated and irrigable lands, subsequently revised to correct for errors ("the Decker Report"). The report was subsequently submitted to the Utah State Engineer as the Ute Indian Tribe's Book of Claims.

42.     The Decker Report organized Reservation lands into seven different categories, based on their use status and source, as follows:

Group 1: lands included in the Uintah Indian Irrigation Project that have a water right decreed by the Federal Court in 1923 from the Lake Fork and Uinta rivers. Acreage: 59,222 (reduced by 549 acres from the 1923 Decrees).

Group 2: lands included in the Uintah Indian Irrigation Project that have a water right certified by the State of Utah from the Duchesne River.  Acreage: 18,613 (includes townsites).

Group 3: lands that are or can be served from the Duchesne River through the Uintah Indian Irrigation Project facilities.  These lands either have a supplemental water right certified by the State of Utah or do not have a water right certificate, but have been designated as irrigable.  Acreage: 1,115.

Group 4: lands that have been found to be productive and economically feasible to irrigate from privately constructed ditch systems diverting from the Duchesne River or its tributaries above Pahcease Canal.  Some of these ditches are now in operation, while others have not yet been constructed.  Acreage: 1,480.

Group 5: lands that have been found to be productive and economically feasible to irrigate, and were proposed to be served from the ultimate phase of the Central Utah Project.  Acreage: 29,118.

Group 6: lands lying east of the Green River for which water right applications have been filed with the State of Utah to be served from the White River.  Acreage: 5,544.

Group 7: lands lying east of the Green River that have been found to be productive and economically feasible to irrigate from privately constructed ditch systems diverting from various streams.  Acreage: 14,109.

The total irrigable acreage, consisting of historical, present, and future irrigable lands, identified in the Decker report (*i.e.*, the sum total of the acreage comprising Groups 1-7) was 129,331 acres.

C.   **DUTY AND RIGHTS CREATING SOURCES OF LAW GIVING THE UNITED STATES PERVASIVE, COMPREHENSIVE, AND EXCLUSIVE CONTROL OVER THE ESTABLISHMENT, MANAGEMENT, AND DEVELOPMENT OF UTE WATER RIGHTS, ASSETS, AND RESOURCES**

43.   Since the establishment of the Reservation and under subsequent Congressional Acts, Executive Orders, federal regulations and contracts, the United States has established and maintained pervasive and comprehensive control over the Tribe's reserved water rights and water resources.  Duty and rights-creating sources of law which establish pervasive and comprehensive control over the Tribe's water rights and water resources, or which otherwise give rise to money-mandating fiduciary obligations on the part of the United States, include, but are not limited to:

a.   The Act of March 1, 1899, 30 Stat. 941;

b.   The Act of June 21, 1906, 34 Stat. 325;

c.   The Department of Appropriation Act of March 3, 35 Stat. 811 (1909);

d.   The *Cedarview Irrigation Company*, no. 4427, slip op. (D. Utah 1923) and *Dry Gulch Irrigation Company*, No. 4418, slip op. (D. Utah 1923), Decrees in Equity No. 4423 & 4418 (March 16, 1923) ("1923 Decrees");

e.   22 Fed. Reg. 10479 (Dec. 24, 1957);

f.   The Act of May 28, 1941, 77 Cong. Chpt. 141, 55 Stat. 209;

g.   The Agreement between the Ute Tribe, the United States, and the Central Utah Water Conservancy District, dated September 20, 1965;

h.   National Historic Preservation Act of 1966 (NHPA; Public Law 89-665; 54 U.S.C. 300101 et seq.);

i.   The Central Utah Project Completion Act, P.L. 102-575 (1992);

j.   The Cost-Sharing Agreement between the United States and the Central Utah Water Conservancy District, dated August 11, 1993;

k.  Cooperative Agreement between the United States of America and the Uintah Indian Irrigation Project Operation and Maintenance Company, dated October 1, 2000;

l.  25 C.F.R. Part 171;

44.     The rights listed in the preceding paragraph are more fully explained in the following subsection.

**D.     THE FEDERAL GOVERNMENT'S LOSSES OF, FAILURES TO PROCURE AND PROTECT, TRANSFERS OF, CONVERSIONS OF, AND WASTE AND MISMANAGEMENT OF THE UTE TRIBE'S WATER, WATER WORKS AND RELATED RIGHTS**

**i.     Mismanagement of the UIIP and its Related Water Rights**

45.     In 2016, the UIIP, which was designed to serve about 88,000 acres of allotted lands, was only delivering irrigation water to approximately 61,000 acres of land, resulting in the annual waste and non-use of Tribe's water rights for tribal lands and concomitant economic loss.

46.     This non-irrigated UIIP acreage is attributable to mismanagement of the UIIP and associated lands and water rights by the United States.  Such mismanagement includes, but is not limited to, the failure to provide storage, unlawful transfers of water rights under the color of the 1941 Act, deferred UIIP maintenance, and the current designation of UIIP lands as either permanently non-assessable or temporarily non-assessable.

a.  Development and Construction of the Uintah Indian Irrigation Project

47.     In the Act of June 21, 1906, the United States Congress authorized the construction of irrigation systems to irrigate "the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah."  The Congressional authorization stated

> [t]hat such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah, and the title thereto until otherwise provided by law *shall be in the Secretary of the Interior in trust for the Indians, and he may sue and be sued in matters relating thereto*[.]

48.     Through its special relationship with the Tribe and the establishment of the Reservation, the irrigation system constructed under the 1906 Act for the Indians is communal property of the Tribe from which the Tribe itself and individual allottees and their successors receive a benefit, and title to the UIIP at all times has been and remains held by the United States as a trust asset of the Tribe.

49.     The Indian irrigation project authorized under the 1906 Act is now known as the Uintah Indian Irrigation Project.  The Project was to be designed and constructed to benefit the Ute Indians.

50.     Pursuant to the 1906 Act, the Bureau of Indian Affairs designed an Indian irrigation system to irrigate about 88,000 acres of allotted land ("UIIP Lands"), via an extensive system of canals and ditches to convey water from three river drainages: the Strawberry-Duchesne, Lakefork-Yellowstone, and the Uintah-Whiterocks rivers.  In 1914, the Secretary of the Interior reported to Congress that construction had been completed on eighteen principal ditches to irrigate the 88,000 acres.

51.     In preparation for the Congressional authorization to construct an irrigation system for the Ute Indians, and prior to the 1908 *Winters* decision, the United States in 1905, through the BIA, applied to the Utah State Engineer for the appropriation of water from the State of Utah for the UIIP.  Some ten years later, the State issued water right certificates to the United States Indian Service, to hold the water rights in trust for the benefit of the Tribe.

52.     Proof of beneficial use of waters on the Reservation was only made by the Indian Service with the State Engineer, on behalf of the Tribe, for the Indian allotments and former allotments, which resulted in the State Engineer issuing certificates of proof for 78,950 acres.  On information and belief, no further effort was made by the United States to conserve, preserve, and

confirm the water rights for the other approximately 10,000 acres of allotted lands that were to receive water under the UIIP. Further, the United States completely ignored the future needs of the Tribe and its members for the waters of the Reservation for irrigation and other purposes. The early efforts to establish the Reservation as a permanent homeland for the Ute Tribe has never recovered from the United States' failure to preserve and protect the waters of the Reservation for the Tribe and its members.

53.     Upon information and belief, more than half of the trust lands under the UIIP are currently held in trust by the United States on behalf of either the Tribe or individual Indian allottees or their successors in interest.

54.     In the early years of the UIIP, the United States initiated a program to level, clear, plow, and fence the Indian allotments to get them into cultivation.

55.     Construction continued through about 1922, at which time the UIIP was considered to be essentially completed, except for construction of a storage facility. In 1956, a total of 78,086 acres were being assessed by the Indian Irrigation Service for water deliveries to farms, including both tribal trust lands and allottee lands. There was an additional 15,297 acres of non-Indian water rights that were served through contractual agreements with private irrigation companies in which the UIIP delivered water to such companies and private systems.

56.     Although numerous Indian allottees at this time did not benefit from the UIIP, the United States nonetheless continued to assess Indian allottees for UIIP construction and maintenance charges each year since 1915. Then, when allottees became delinquent on UIIP assessments, no water was delivered to the Indian lands, and the indebtedness accumulated, which led to a loss of Indian-owned lands through the forced sale of these lands without any monetary

benefit to the allottees.  This ultimately resulted in a significant reduction in Indian-owned lands that were meant to be included in the UIIP.

      b.     <u>Failure to Provide Storage</u>

57.    At the time the UIIP was authorized, and at all times relevant thereafter, the United States was aware of non-Indian private irrigation activities to construct storage facilities in the Uinta Basin that would interfer with the natural flows of the Lakefork and Uinta Rivers—rivers whose natural flows have always been insufficient to meet the irrigation needs of the Tribe and its members.

58.    In its 1916 Bill of Complaint to adjudicate a portion of the Tribe's Reserved Water Rights, the United States acknowledged that insufficient natural flow exists in the Uinta-Whiterocks and Lake Fork-Yellowstone River Basins to properly irrigate Indian lands.  The United States attested to the court that

> [t]he water supply of said Uintah River, except when said river is at stages of high flow, is and at all times has been insufficient to supply the needs of the United States and said Indians for the irrigation of the irrigated lands . . . with the consequence that the waters of said river, *unless conserved by storage*, will become progressively less able to supply the needs of the United States and of said Indians. . . . (emphasis added).

59.    The United States also relied on the Congressional legislation creating the Reservation, in which the United States set apart lands "at the head-waters of the streams . . . as forest reserve lands, [so that] "the water supply [for the] Indians would be maintained," and reserved tracts for such reservoir sites.

60.    The federal district court adopted the United States' position that storage was essential to preserve and protect the water supply for the irrigation needs of the Indians, and recognized that reservoirs would be required, and that the UIIP would construct storage to serve the tribal lands.  The court did so by providing for an eight-month period of use annually

beginning on March 1st and running through November 1st—a period of use that extends the Tribe's ability to divert and use the waters from the designated rivers almost two months longer than water delivered by natural flow via the canals and ditches of the UIIP.

61.     The United States knew at the time of the 1916-1923 water rights adjudication that the water duty assigned by the federal court for purposes of irrigating the designated Indian trust lands, that is, 3.0 acre-feet per acre per year, was insufficient to satisfy the agricultural water needs of the Indian trust lands—resulting in either a failure to protect and preserve sufficient water supply for the Ute Tribe's agricultural efforts to succeed, or the United States expected that storage would be constructed to supplement the deficient direct natural flow water duty.

62.     Numerous past and present studies have shown that a diversion duty of 4.0 acre-feet per acre per year (33% more than that issued in the federal decrees) is the amount of water actually needed to provide proper irrigation for economically beneficial agricultural pursuits. Upon information and belief, the insufficiency of the 3.0 acre feet per acre per year water duty was known by the United States at the time the 1923 decrees were issued.

63.     Several quantifications of tribal water shortages have been computed over the past century. Water shortages on these lands are frequent: on average, seven (7) to eight (8) years out of ten (10) the Tribe and its members experience water shortages.

64.     The Ute's Tribe's Reserved Water Rights that cannot be diverted to non-existent storage before the irrigation season begins and after the season ends (that is, March 1 to November 1) are wasted, lost, and flow downstream to be used by non-tribal, state-based water users and/or by non-Indian water users, including in the Lower Basin of the Colorado River, as surplus water, without any economic benefits to the Tribe.

65.     Well-documented water shortages support the conclusion that the United States' trust responsibility to the Tribe includes the obligation to provide for tribal water storage in order to both (1) preserve, protect, and develop the Reserved water rights awarded in the 1923 Decrees and (2) supplement these decreed water rights, as needed, so that there is sufficient water available for full irrigation of all lands served by the UIIP.

66.     No tribal water storage for the lands under the Uintah Indian Irrigation Project exists today.  Defendant has failed to provide tribal storage for its 1923 federally-decreed Reserved Water Rights, resulting in substantial economic losses to the Tribe and its members.

67.     Storage, combined with natural flow, is the only way the Tribe can fully develop its Reservation lands and put its Reserved Water Rights to use.  Unfortunately, a review of federal support for the development of storage on the Reservation leads to the clear conclusion that the United States has engaged in a course of conduct that consistently places the needs of non-Indian water users ahead of the needs of the Ute Indian Tribe.

68.     The need for tribal storage for the trust lands irrigated under the Uintah Indian Irrigation Project has been clearly and repeatedly documented for over 100 years, since the early 20th Century.  An extensive historical record supports the conclusion that the Federal Government, through both the BIA and the Bureau of Reclamation ("Reclamation" or "BOR"), has long known and recognized the fact that both storage and natural flows are needed to fully develop and use the Tribe's Reserved Water Rights, and, in fact, that the Tribe's Reserved Water Rights and the trust resources upon which these Reserved Water Rights depend have suffered from poor Government management.

c.   Unlawful Secretarial Transfers of Water Rights

69.     In the Act of May 28, 1941, 55 Stat. 209, Congress authorized the Secretary to "transfer water rights, *with the consent of the interested parties*, to other lands under [the UIIP] and to make necessary contracts to effectuate such transfers."  (emphasis added)  As the beneficial owner of the water conveyed through, and lands served by, the UIIP, the Tribe is obviously an "interested party" within the meaning of the 1941 Act.  The intent of the Act was to preserve the water rights serving the UIIP "by transferring those rights to more desirable lands.  Water rights from Indian-owned poor lands would be transferred to better lands in Indian ownership, and similar rights as to non-Indian lands would be transferred to more desirable non-Indian lands."

70.     The 1941 Act contributes to the United States' comprehensive and pervasive control over the transfer of Tribe's Reserved Water Rights under the UIIP.

71.     The Ute Tribal Business Committee opposed the 1941 Act because they believed would be the confiscation of the Tribe's water rights for their Indian lands and its use for the Central Utah Project, creating a threat to the Tribe's economic well-being unless sufficient water rights to adequately cover all irrigable trust lands were retained.  The Tribal Business Committee therefore passed a resolution objecting to the water transfers, and asked the Secretary to take steps to protect Indian Reserved Water Rights.  The Business Committee's fear that the United States would not protect Tribe's water rights has been borne out over time and up to the present time.

72.     On information and belief, the United States violated its trust obligations to the Indians and perverted the Congressional intent and authority under the 1941 Act by making false promises to Indian landowners and adversely influencing and pressuring Indian landowners to place tribal lands into a permanently non-assessable ("PNA") status, Class III, under the UIIP. The Government then transfered the Indian landowners' rights—i.e., the right to use Tribe's

Reserved Water Rights assigned to their lands for irrigation purposes and other purposes—to other lands.  On information and belief, the United States told the Tribe and its members that if the Tribe and its members acquiesced in placing tribal lands into the PNA Class III land status, the Tribe and its members would be able to sell their water right or transfer it to other tribal lands.  Based on the United States' lack of full disclosure, the Tribe and its members understood that they could keep their tribal water rights indefinitely.

73.     On information and belief, the United States even conditioned its authority under the law to suspend or defer irrigation charges assessed against the Indian property under the UIIP to threaten and compel the Indians to consent to the extinguishment and loss of their tribal water rights.

74.     However, on information and belief, once placed in PNA status, the United States transferred the use of the Indian Reserved Water Right to lands other than those owned by the Tribe and its members.  On information and belief, neither the Tribe nor its members knowingly consented or entered into agreements for the transfer of tribal water off of Indian allotments and tribal trust lands (including the federally-decreed water rights designated for their lands), and such transfers eliminated the ability of the Tribe and its members to irrigate allotted and tribal trust lands.  Further, the United States failed to fully disclose that, without appurtenant tribal water, the value of the Indian allotments and tribal lands without the Tribe's water rights would be significantly decreased after the Secretary's water rights' transfers, and, in fact, would be worthless.  The Government, however, knew and admitted at the time that the Tribe and its members lacked full knowledge and understanding of their rights.  The Indians who lost their right to use the Tribe's water to irrigate their lands under the UIIP were not only deceived by the Government, but were not justly compensated for this loss.  Many of the Indian lands placed into

PNA Class III status were later deemed incapable of supporting irrigation, either because the United States failed to complete construction of UIIP canals, ditches, and other water works to these Indian trust lands, or because the United States failed to make timely repairs and to rehabilitate UIIP water works so as to facilitate the delivery of water to these farm headgates.

75.     The Secretary transferred the Tribe's water rights from about 10,000 acres of trust lands placed into PNA Class III, non-irrigable lands under the UIIP, to other lands, some of which were non-Indian lands both on and off the Reservation, resulting in the loss of a significant amount of Tribe's Reserved Water Rights for the use of the Tribe and it members annually.  This included water rights for some of the Tribe's aboriginal lands.  At all times, the United States was acting as the trustee of the Reserved Water Rights for the Tribe.

76.     The Secretarial transfers of the Tribe's water rights under the UIIP pursuant to the 1941 Act resulted in the Tribe's water rights being transferred from Indian lands to non-Indian lands under the UIIP and from Indian lands on the Reservation to non-Indian lands outside of the UIIP.

77.     A Congressional House Report also reported that Indian farmers within the UIIP were suffering from economic underdevelopment because certain lands within the UIIP were less suitable for farming, and the UIIP was in a "desperate economic situation."

78.     The Indians were not compensated for the loss in the value of their lands due to the Secretary's water rights' transfers from their lands, and the unlawful water rights' transfers have resulted in the significant loss in irrigated lands under the UIIP, as well as the ability to use the Reserved Water Rights for other purposes.

79.     The Secretary of the Interior failed to keep the paramount rights of the Ute Indians to the waters of the streams on the Reservation in mind, as he was required to do, when transferring

the Tribe's water rights for irrigation and other purposes to non-Indian lands on and off the Reservation. In short, the United States failed to protect the rights and interests of the Indians to their current and future water needs.

80. In spite of knowledge that the 1923 federal water rights decrees provide an enforceable protection for the Tribe's Reserved Water Rights under the UIIP against secondary priority, state-based water users in the basin, the Secretary of the Interior has operated the UIIP for by annually providing the Utah State Water Commissioner with the actual acres that are currently being cropped to determine the amount of water that will be delivered during the irrigation season. The Secretary has done so with full knowledge that the Utah State Engineer, in contrast, was providing the State Water Commissioner with a list of the certified acreages for which water rights were to be delivered to non-Indian lands with secondary priority water rights without properly account for whether all the certified acreages of the non-Indian lands remained under production. This management strategy has significantly benefitted the non-Indian, secondary water rights holders under the UIIP (by ensuring that more water was available in the natural flow for the secondary water users), but it has significantly failed to benefit and protect the Tribe and its members under the UIIP.

81. In addition, the United States has made little to no effort to reduce the excessive seepage in the UIIP canals that results in significant Indian Reserved Water Rights losses and waste while sorely needed for the Indian trust lands under the UIIP.

        d.  Deferred Maintenance of the UIIP

82. From the construction of the UIIP to the present, the BIA has been the party ultimately responsible for the operation and maintenance of the UIIP.

83.     Specific and comprehensive Federal regulations governing the BIA's operation and maintenance of the UIIP were promulgated prior to 1957 as 25 C.F.R. Part 121, and subsequently renumbered as Part 199 on December 24, 1957, 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957) ("1957 regulations").  These regulations applied specifically to the UIIP and reinforced the BIA's pervasive and comprehensive control of the UIIP.

84.     The 1957 regulations continued a system for the assessment of operation and maintenance fees payable by landowners within the UIIP.  The regulations provided that "Bills for the yearly assessment of construction and operation and maintenance charges will be issued each year for the record owner of land within the project," with an "annual per-acre charge for operation and maintenance…levied against the entire irrigable area of each farm unit or allotment to which irrigation water can be delivered from present constructed works."

85.     In addition to establishing a system for assessing operation and maintenance fees, the federal regulations reinforced the United States' pervasive and comprehensive control over the UIIP.  Section 199.20 of the regulations stated that "[n]o persons other than those specifically designated by the project engineer are authorized to regulate project structures or to interfere in any way with project-operated canals or any works appurtenance thereto or to the water flowing therein."   The term "project engineer" was in reference to the BIA engineer charged with implementing the regulations.

86.     The federal regulations also required the BIA to deliver water to "one point on the upper boundary of each farm unit on the project," and to "maintain the lateral system to said delivery point."  These requirements confirmed that the United States' pervasive, comprehensive, and exclusive control over UIIP operations extended up to the property boundaries of individual irrigators.

87.     In 2008, the United States promulgated regulations governing the operation and maintenance of all Indian irrigation projects administered by the BIA, including the UIIP.  The United States' exclusive responsibilities relating to the operation of the UIIP, as reinforced by the prior federal regulations, remain in full force and effect in the 2008 regulations.

88.     On October 1, 2000, the United States and a private company known the Uintah Indian Irrigation Project Operation and Maintenance Company ("O&M Company"), entered into a Cooperative Agreement, in which the O&M Company assumed responsibility over the day-to-day operation and maintenance of the UIIP.

89.     The O&M Company is not owned or in any way controlled by the Tribe.  It is a private company functioning as an arm of the Federal Government by assuming some of the responsibilities normally delegated to the BIA.

90.     The Cooperative Agreement expressly states that the BIA's trust responsibility toward the UIIP remains fully intact despite the O&M Company assuming day-to-day operation and maintenance tasks, and that the United States retains its legal ownership of the UIIP.

91.     Further, the Cooperative Agreement provides the BIA with a substantial degree of oversight authority over the O&M Company's activities.  For instance, under the Cooperative Agreement, the O&M Company is required to produce an Annual Operating Plan each year containing a comprehensive work and budget plan for the year.  This Annual Operating Plan must be approved by the BIA.

92.     The BIA also remains responsible for UIIP recordkeeping, billing, and collections of the annual O&M fees from UIIP water users, and for negotiating and executing carriage agreement.

93.     Over the past several decades, as a direct and proximate result of inadequate maintenance by the United States, the UIIP has fallen into a grave state of disrepair.

94.     In 1982, HKM Associates prepared a Rehabilitation and Betterment Plan for the UIIP that was submitted to the BIA.  In its Rehabilitation and Betterment Plan, HKM Associates concluded that 84% of UIIP structures were in need of rehabilitation.  HKM ASSOCIATES, UINTAH INDIAN IRRIGATION PROJECT REHABILITATION AND BETTERMENT PLAN at 12-13 (Sept. 1982).  HKM Associates further concluded that of the 651 miles of UIIP waterways, 387 miles required reconstruction, 20 miles required concrete lining, and 11 miles required installation of pipelines.  *Id*. at 13.  Brush removal was required on 260 miles of UIIP waterways.  *Id*.  HKM also found rehabilitation needs in operation and maintenance roads running along approximately 132 miles of UIIP canals, as well as the need to install approximately 288 lineal miles of fence along main canals in order to "control access to UIIP waterways."  *Id*.

95.     The HKM report noted substantial erosion on UIIP waterways, infestation of brush and trees in the bank areas of UIIP waterways, sections of UIIP canals damaged by livestock, and excessive water seepage.  *Id*. at 11.  These and other suboptimal conditions have diminished UIIP efficiency and prevented the UIIP from delivering water to a portion of UIIP Lands.

96.     In 1988, both the tribal engineer and the Department of Interior recommended $75,000,000 to rehabilitate the UIIP.  In 1989, a detailed BIA analysis of the UIIP's financial operation revealed that the UIIP's annual income amounted to only 50% of the Project's operations and maintenance (O&M) needs.  At the time of the 1992 legislation, the UIIP's O&M cost the Bureau approximately $700,000 per year, but the UIIP was bringing in only roughly $525,000 per year in assessments.  The BIA recommended that it contract the O&M under a cooperative agreement or grant in order to relieve the UIIP of the federal rules and regulations that prevented

flexibility in controlling UIIP costs, and the recommendation was incorporated into Title II of Central Utah Project Completion Act (P.L. 102-575) ("CUPCA").  The Secretary of Interior, however, retains trust responsibilities to the UIIP.  Richard C. Whitesell, Acting Deputy to the Assistant Secretary of Indian Affairs, testified at a 1988 Congressional hearing on H.R. 5307 that rehabilitation of the UIIP was one of four "remaining issues" that needed to be resolved with regard to the Tribe's water rights and resource development issues.

97.  In 2008, a report issued by the BIA asserted:

> The Uintah [Indian] Irrigation Project has deferred maintenance needs in excess of $86.1 million to bring the aging, deteriorated infrastructure up to current standards. The majority of our diversion structures lack any safety features to keep personnel safe while operating gates and cleaning debris for the upstream side of the structures.  There is no fencing or gates to prevent the general public from getting on any of our structures of features.

U.S. Dept. of Interior, BIA, Western Region, "Operation and Maintenance Guidelines: Uintah Indian Irrigation Project, Uintah and Ouray Agency" (Dec. 23, 2008).

98.     The Tribe has yet to see the comprehensive rehabilitation of the UIIP promised by the United States.  The poor condition of the UIIP has resulted in the inability of the UIIP to deliver available water to irrigable lands within the Project.  The UIIP's disrepair has also been a contributing factor in UIIP lands being designated as temporarily non-assessable or permanently non-assessable.

99.     One cause of wear and tear on the UIIP is the use of UIIP facilities to deliver a significant amount of water to non-Indian secondary water users outside of the UIIP pursuant to carriage agreements.

100.     A review of carriage agreements executed by the BIA for the use of UIIP facilities to deliver water outside the UIIP suggests that the United States has neither reviewed, nor renegotiated, the carriage agreements in decades.  That is significant, in part because some of the

carriage agreements set a fixed annual per-acre rate for the operation and maintenance fee assessed to the recipient of the water.  Other carriage agreements require the recipient of water to pay only a small portion of the per-acre operation and maintenance fee assessable to UIIP lands.  In either case, operation and maintenance fees under these carriage agreements are not commensurate with current operation and maintenance fees assessed to UIIP lands.

101.    The United States' failure to complete construction of the UIIP has prevented the Tribe from establishing a viable agricultural economy that can contribute to the purpose of the Reservation as a permanent homeland for the Tribe and its members.

e.    Designation of UIIP Lands as Temporarily or Permanently Non-Assessable

102.    Since the time the BIA began operating a system to irrigate 78,950 acres of land, the BIA has designated a substantial portion of this designated acreages as either temporarily non-assessable ("TNA") or permanently non-assessable ("PNA").

103.     According to the BIA's 2008 National Irrigation Handbook, the primary reasons for designating lands as TNA or PNA are limiting factors such as topography, soil conditions, or the inability of the project to deliver water.

104.    These TNA/PNA lands are lands that have been deemed by the BIA as either temporarily or permanently incapable of being irrigated under the UIIP, despite being included within the acreage that was initially designated by the BIA to be irrigated under the UIIP.

105.    These TNA/PNA designations have resulted in a reduction in irrigated acreage under the UIIP, which has an adverse economic impact on the Tribe and its members.  Further, as a result of these TNA/PNA designations, there is less funding available to maintain the UIIP, as the operation and maintenance fees assessed to landowners within the UIIP is based on the amount of presently assessable acreage within each landowner's parcel. 25 C.F.R. § 505.75.  Therefore,

when land within the UIIP is deemed non-assessable, there is a corresponding reduction in the funding available to operate and maintain the UIIP.  This, too, has had an adverse economic impact on the Tribe and its members.

106.    A significant portion of UIIP acreage designated TNA or PNA is directly attributable to the mismanagement of the UIIP by the United States, including, the United States' failure to sufficiently maintain and rehabilitate UIIP Lands and UIIP facilities.

107.    A disproportionately high portion of the UIIP Lands designated as TNA or PNA are Indian trust lands, owned either by the Tribe or tribal members.  While tribal and allotted lands comprise over half of the UIIP Lands, on information and belief, the tribal and allotted lands comprise over 98% of the UIIP Lands that are currently in TNA status.  Similarly, on information and belief, tribal and allotted trust lands comprise over 93% of the UIIP Lands that are currently in PNA status.

108.    Because poor UIIP maintenance and rehabilitation causes lands to become non-assessable, the disproportionately high representation of tribal and allotted trust lands within the UIIP designated as TNA or PNA supports the conclusion that the UIIP operation and maintenance fees have been used over the life of the UIIP to the disproportionate benefit of non-Indian fee landowners receiving Reserved Water Rights under the UIIP, as well as the delivery of water for non-Indian, secondary water rights holders through formal and informal carriage agreements with the BIA.

  f.   Midview Exchange Agreement

109.    In 1967, the United States entered into an agreement with the Tribe and an organization of non-Indian, secondary water rights irrigators, known as the Moon Lake Water Users Association ("Association"), providing for water right exchanges and transfer of irrigation

facilities (n/k/a the Midview Exchange Agreement or "Midview Exchange").  Under the Midview

Exchange, the BIA transferred a portion of the Tribe's 1923 federally-decreed Reserved Water

Rights in the Lake Fork River to the BOR "for the use and benefit of the Moon Lake Project."  As

set forth in the 1923 Decrees, these *Winters* reserved water rights have a priority date of October

3, 1861.  The Midview Exchange guaranteed that the minimum Association acreage to be served

by the Lake Fork River "shall not be less than" the total acreage serving the UIIP from the

Duchesne River, but "in no event less than 7,500 acres"—providing the Association with a

minimum acreage of 1861 Reserved Water Rights regardless of whether the UIIP was irrigating

fewer acreages, primarily trust lands, under the agreement.

110.  In exchange for the transfer of a portion the Tribe's *Winters* reserved water rights

in the Lake Fork River, BOR agreed to transfer to the BIA for the use and benefit of the UIIP, two

state-based water rights in the Duchesne River, with inferior priority dates of June 22, 1918, and

August 3, 1922.

111.  The Tribe's receipt of state-based water rights under the exchange is significant

because, in contrast to *Winters* reserved water rights, the state-based water rights that the Tribe

received under the exchange can be lost and forfeited through non-use under Utah state law.

112. As part of the agreement to transfer the Tribe's senior-priority, Reserved Water

Rights for the use and benefit of the Association, BOR and the Association agreed to transfer the

right, title, and interest in the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne

Feeder Canal, and Midview Lateral together with all facilities and property appurtenant thereto

(collectively, the "Midview Property") to the BIA to operate and maintain "as part of the [UIIP],"

including the making of necessary replacements.  The Midview Exchange provided that "[s]uch

transferred works shall become part of the project works of the Uintah [Indian Irrigation] Project." The Midview Property includes 655.50 acres underlying the Dam and Reservoir.

113.    Because the Midview Property was to be transferred to the BIA as part of the UIIP—a tribal trust asset held by the United States in trust for the Tribe's benefit—the Tribe was promised and understood that the Tribe would hold equitable title to the Midview Property.  The United States, however, has never transferred the Midview Property to the UIIP as a tribal trust asset.  The United States, therefore, has breached its contractual obligation under the Midview Exchange, violated its fiduciary duties to the Tribe, and violated federal law.

114.    Additionally, on information and belief, as a result of the BIA's decisions to designate Indian trust lands served under the Midview Exchange as temporarily non-assessable or permanently non-assessable—and thus ineligible to receive water for some of the irrigated lands— about 1,500 acres of trust lands are no longer irrigated under the Midview Exchange.  Meanwhile, the Moon Lake Water Users Association continues to use the Tribe's Reserved Water Rights in the Lake Fork River to serve the 7,500-acre minimum set forth in the Midview Exchange.

115.    The Midview Exchange has been and continues to be an inequitable exchange for the Tribe and other trust land irrigators.  The United States has failed to address this inequity, which has resulted in, and continues to result in, substantial economic losses to the Tribe and other trust land irrigators.

116.    In 1968, the parties to the Midview Exchange signed a Transfer Agreement providing for the internal transfer of the Midview Property from BOR to the BIA to become part of the UIIP, stating:

> Pursuant to Article 8 of the [Midview Exchange], the Bureau of Reclamation and the Moon Lake Water Users Association hereby transfer· to the Bureau of Indian Affairs the jurisdiction of the right, title, and interest in and to the Midview Dam

and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with the facilities and property appurtenant thereto.

117.    Through the 1968 Transfer Agreement, the BIA expressly accepted jurisdiction over the Midview Property and agreed to "operate and maintain said facilities including necessary replacements as a part of the Uintah Indian Irrigation Project."

118.    Unbeknownst to the Tribe, the United States never completed the underlying paperwork to formally transfer the Midview Property from BOR to the BIA.  The Tribe did not learn of this omission until the BIA was asked to approve an easement for rights-of-way ("rights-of-way") to Duchesne County in 2014.

119.     The purpose of the rights-of-way to Duchesne County was for the "construction, maintenance, repair, inspection, protection, operation and removal" of a new culinary water pipeline known as the Victory Pipeline.  In 2014, the United States issued rights-of-way to Duchesne County to access lands within the Midview Property, notwithstanding the Tribe's objection to the rights-of-way which the Tribe had made known to the BIA.  The BIA neither obtained the Tribe's consent to the right-of-way, nor ensured that the Tribe received just compensation for the right-of-way.  The United States has refused to recognize, and in fact, has denied the trust status and the Tribe's beneficial ownership of the Midview Property.

120.    The Tribe also has not received a significant benefit of its bargain under the Midview Exchange, nor, on information and belief, has it been fairly compensated for the promise to construct the Taskeech Reservoir on Lake Fork by the United States as a feature of the Upalco Unit of the Central Utah Project.  If constructed, the Taskeech Reservoir would have provided storage for the Tribe's water rights, as well as obligated the Association to transfer to the Tribe all of its right, title, and interest in and to the Twin Pots Reservoir with a ten-second-foot carriage right through the Farnsworth Canal to the reservoir, and the Tribe was denied compensation for a

33

right-of-way across Indian land to a portion of the Farnsworth Canal that the Midview Exchange promised the Association.

121.    Because the Midview Exchange provided for the conveyance of title to adjudicated, Tribe's Reserved Water Rights under the UIIP, the Midview Exchange is an illegal conveyance of tribal trust property under 25 U.S.C. § 177.  Yet, the parties to the Midview Exchange, including the BIA, continue to satisfy the terms of the Midview Exchange as if the Exchange is legally efficacious when it is not.

122.    In 2016, the Bureau of Indian Affairs, responding to a formal request by the tribal leadership, the Ute Tribal Business Committee, informed the tribal leadership that it would not hold the Midview Property as a tribal trust asset, as promised to the Tribe in the Midview Exchange, but instead, would continue to hold the property as government fee property.  Efforts by the tribal leadership to convince the BIA otherwise have been unsuccessful.

123.    On information and belief, the UIIP remains burdened by its obligation to deliver water to stockholders in the Association through UIIP facilities at only the cost of operation and maintenance fees charged to the Indian users of the UIIP; no additional costs for the carriage of water to non-Indian Association water users are charged to support the rehabilitation and betterment of the UIIP, which has documented significant deferred maintenance needs.

124.    In violation of the Midview Exchange, the BIA is now using water from the Midview Reservoir to irrigate lands other than those designated for irrigation under the Midview Exchange, in particular, lands under the Pahcease canal which has a direct flow right from the Duchesne River.  The BIA's diversion of water to other lands reduces the amount of stored Duchesne River water that the Tribe is entitled under the Agreement to use for purposes other than irrigation, resulting in economic loss to the Tribe.

### ii.   Unlawful Action/Inaction by the United States Relating to the 1965 Deferral Agreement

125.   The purpose of the land classifications set forth in the 1960 Decker Report was to determine the full apportionment of the Tribe's Reserved Water Rights from the Colorado River Basin and its effect on, or interference with, the development of the Central Utah Project ("CUP"), a major project to develop Utah's apportionment of water from the Colorado River Basin. Construction of the CUP was authorized by Congress in the Colorado River Storage Project Act of 1956, with construction to be the responsibility of the BOR.

126.   The CUP was sponsored by the Central Utah Water Conservancy District ("CUWCD"), a political subdivision of the state of Utah.

127.   The central component of the CUP is the Bonneville Unit, a substantial trans-basin water delivery project designed to move water from various Reservation streams in the Uintah Basin across the Wasatch Mountains to the Wasatch Front (a metropolitan region in Utah containing several contiguous cities, including Salt Lake City, Provo, Ogden, and others).

128.   The feasibility of the Bonneville Unit depended upon the diversion and transfer of water from the Uintah Basin, in particular, the Duchesne River, to the Bonneville Basin. However, the state water targeted for transfer via the Bonneville Unit had a later priority date than the Tribe's *Winters* reserved water rights, including waters designated to serve the Tribe's Group 5 lands in the Decker Report, which are sourced, in part, from the Duchesne River.

129.   The CUWCD knew that the United States Congress would not fund the Bonneville Unit without the Ute Tribe's agreement to defer the development of a portion of the Tribe's Group 5 lands, sourced from the Duchesne River. Therefore, on September 20, 1965, the CUWCD entered into an agreement with the Tribe and the BIA, whereby the Tribe agreed to defer the development and use of its Reserved Water Rights for the development of 15,542 acres of the

29,118 acres of Group 5 lands, quantified in the Decker Report; this in turn allowed the State of

Utah and the Department of Interior to secure funding for the Bonneville Unit of the CUP by

certifying to Congress that there were uncontested water rights for the Bonneville Unit and it could

proceed with construction without the Tribe's interference or adverse claims against the State and

CUP ("1965 Deferral Agreement").

130.    The parties to the 1965 Deferral Agreement understood and agreed that a

substantial part of the quid pro quo for the Tribe's agreement to defer development of 15,542 acres

of its Group 5 lands was the other parties' "full and complete recognition of the Tribe's Reserved

Water Rights as quantified in the Decker report and described in the Book of Claims filed with the

State Engineer, State of Utah, by the Ute Indian Tribe, *without resort to litigation*."  (emphasis

added)   Stated differently, construction of the Bonneville Unit could only proceed because the

Tribe had received stipulations from the United States and the State of Utah, through its

instrumentality, the CUWCD, that the apportionment of the Tribe's Reserved Water Rights from

the Colorado River Basin would be as described for Groups 1-7 in the Decker Report, and that the

Tribe's Reserved Water Rights would have priority dates consistent with the Winters Doctrine,

and would not be adjudicated in any contested court proceeding.

131.    The Tribe's bargained-for consideration in entering the 1965 Deferral Agreement

also included the United States' promise to provide supplemental water and to address the Tribe's

need for water storage.  The United States agreed that the planned Upalco and Uintah Units of the

CUP would provide the stored water desperately needed by the Tribe for the delivery of its

Reserved Water Rights for the UIIP.  In Section 10 of the Agreement, the Tribe was promised

storage as part of the development of the Uintah Unit to provide supplemental water to the 34,152

acres of UIIP lands from the runoff waters of the Uinta and Whiterocks rivers in Group 1.  The

development of storage under the Uintah Unit was to be "programmed for early authorization and construction."

132.    The cornerstone of the Tribe's participation in the 1965 Deferral Agreement was the promise that the Ultimate Phase of the CUP would provide supplemental and full service water to the Tribe's lands comprising groups 1-5 of the Decker Report.  In a 1988 Memorandum from Regional Solicitor William Robert McConkie to the Superintendent of the Uintah and Ouray Agency of the BIA, Solicitor McConkie stated that it was "the intent that the ultimate phase of the Central Utah Project would supply supplemental water and full service water, as applicable, to all Indian water right lands in Groups 1 through 5" (emphasis in original).  The parties understood that one indispensable component of the Ultimate Phase of the CUP was the construction of the Ute Indian Unit, which was to divert water from the Green River and transport it to supplement the Upalco, Uintah, and Bonneville Units.  Construction of the Ute Indian Unit was the only way the Tribe's storage needs could be fully satisfied through Uintah and Upalco Units.  It was also the only way the Tribe's Group 5 lands could receive full-service irrigation water from the Bonneville Unit.  The Ute Indian Unit was, thus, a lynchpin of the United States' promises to the Tribe under the 1965 Deferral Agreement.

133.    Paragraph 5 of the 1965 Deferral Agreement established a forty-year timeframe for completion of the ultimate phase of the CUP, stating:

> If the ultimate phase of the Central Utah project is not completed sufficiently to supply said Indian water rights by the 1st day of January, 2005, equitable adjustment will be made in accordance with said reserved and perfected water rights or the tribe to permit the immediate Indian use of the water so reserved.  It is agreed that the first day of January, 2005, shall be mutually considered as the maximum date of deferment and that all phases of the Central Utah project will in good faith be diligently pursued to satisfy all Indian water rights at the earliest possible date.

The terms "all Indian water rights" as used in Paragraph 5 of the 1965 Deferral Agreement refers to the full apportionment of the Tribe's *Winters* reserved water rights recognized by the Tribe and the State and Federal Governments as a result of execution of the 1965 Deferral Agreement.

134.    The 1965 Deferral Agreement also contained specific promises relating to the United States' management of the Tribe's water rights.  For example, in Paragraph 8 of the 1965 Deferral Agreement, the United States promised to move the diversion points for the Wissiup, Leland, and Ouray School Canals upstream to the Duchesne Feeder Canal.  This promise was grounded in the United States' acknowledgement that these canals were supplying poor-quality and polluted water to irrigators in the UIIP.

135.    Upon execution of the 1965 Deferral Agreement, the United States and the State of Utah were in a position to seek Congressional funding for the Bonneville Unit by certifying to Congress that the State of Utah had secured an uncontested right to water in the Uintah Basin.

136.    With passage of the Colorado River Basin Project Act of 1968, Congress recognized the 1965 Deferral Agreement as a binding agreement.  The Act amended the Colorado River Storage Project Act of 1956 (*i.e.*, the Act which authorized the construction of the CUP) to account for the obligations under the 1965 Deferral Agreement, stating, in relevant part:

> That the planning report for the Ute Indian unit of the Central Utah Participating Project shall be completed on or before December 31, 1974, to enable the United States of America to meet the commitments heretofore made to the Ute Indian Tribe of the Uintah and Ouray Indian Reservation under the Agreement dated September 20, 1965 (Contract No. 14-06-W-194).

137.    Further, in 1973, the Utah State Legislature passed a Concurrent Resolution in the 40th Legislature, signed by the Utah Governor, recognizing that the Central Utah Water Conservancy District had bound the State of Utah to the conditions and promises made to the Tribe under the 1965 Deferral Agreement, and sought Congressional funding for the Central Utah

Project based on the Tribe's agreement to defer development of a portion of its water rights, thereby eliminating any water rights challenges that could be raised by the Tribe as the Bonneville Unit proceeded with construction.

138.    The United States failed to follow through on the promises to supply water and storage to the Tribe through the systems and facilities of the CUP.

139.    The Upalco Unit, as planned, was to provide storage on the Lake Fork River Basin to serve water supply for both tribal and non-tribal lands.  The principal feature of the Upalco Unit, as planned, was the 78,000 AF Taskeech Reservoir to be built on tribal, Federal, and private lands. Approximately 11% of the total water supply to be developed by Taskeech Reservoir was to supply tribal lands in the UIIP, while 32% of the lands to be taken for reservoir construction were Tribally-owned.

140.    The Upalco Unit was never built.  Although Congress appropriated construction funds for the Upalco Unit in 1981, by 1986, the BOR had indefinitely postponed construction of the Upalco Unit citing increased costs and lack of demand for municipal and industrial water.  The United States never provided a more specific economic justification for abandoning the Upalco Unit.

141.    The Uintah Unit was to provide the greatest of the Central Utah Project benefits to the Tribe.  Original plans called for 64% of the nearly 50,000 AFY of annual supply developed by the unit to be provided to the Tribe.  As envisioned early in the planning stages, the unit would feature two reservoirs: the 47,000 AF Uintah Reservoir and the 32,000 AF Whiterocks Reservoir. These reservoirs would help provide full irrigation of 7,818 acres of tribal land and supplemental service to 34,152 acres of Tribe's water righted land within the Uintah Indian Irrigation Project.

142.    Similar to the Upalco Unit, a long period of time elapsed between the Uintah Unit's initial authorization and its pre-construction activities.   In the late 1970s, the BOR finally undertook geophysical examinations of the proposed Uintah and Whiterocks dam sites, ultimately concluding that the proposed dam sites were unfeasible.

143.    Following the geophysical tests, the United States began to formulate the Uintah Unit as an "all-Indian" project and to investigate alternative dam sites.   The revised plan called for elimination of the Uintah Reservoir and an expansion of the Whiterocks Reservoir to 76,000 AF. The reformulated project would only supply full and supplemental irrigation to tribal lands.

144.    BOR adjusted costs and benefits of the Uintah Unit to reflect the changes in the plans for the development of the Uintah Unit.   Costs were drastically increased while benefits were dramatically reduced.   In fact, the benefit-cost ratio dropped from over 1.2:1 to approximately 0.4:1.   It is unclear why costs and benefits varied so significantly.   However, it is clear that as an exclusively tribal project, BOR found poor economics, but when non-Indians were included as part of the project, the economics drastically improved.

145.    Although BOR knew the reformulated Uintah Unit showed poor economics, it chose to continue planning and study the unit out of its acknowledged commitment to fulfill the Tribe's water rights.   As explained in the 1980 Status Report on the Uintah Unit:

> [T]he 1978 plan and the three alternatives are all economically infeasible. However, the plan to provide strictly Indian development merits further consideration because of special circumstances involving the Ute Indians…Among the major considerations supporting the development of an Indian project are (1) a critical need for economic development to help alleviate serious socioeconomic problems on the Uintah and Ouray Indian Reservation and to help preserve traditional values, (2) the Ute Tribe's claim of an inherent water right prior to non-Indian rights under…the Winters Doctrine, (3) a 1965 agreement between the United States Government and the Ute Indian Tribe which deferred tribal development of Indian water rights and thus allowed the construction of the Central Utah Project to proceed in return for development of Indian water by no later than

the year 2005, and (4) a water compact between the State of Utah and the Ute Indian Tribe…

146.    Planning for the Uintah Unit continued through the early 1980s. However, eventually BOR decided to postpone the Uintah Unit indefinitely.

147.    The United States also abandoned the Ute Indian Unit, which was to provide supplemental waters to the Bonneville, Upalco, and Uintah waters in order to provide water to the Tribe as part of the ultimate phase of the CUP.  In 1980, BOR issued a Concluding Report that effectively abandoned study of the Ute Indian Unit.  Specific justification for abandoning the project was terse and tenuous, and included: (1) lack of social and economic data for the Ute Tribe; (2) unknown future development of energy in the Uinta Basin; (3) wilderness and environmental issues; (4) lack of local, State, and Federal support; and (5) lack of funding and planning for irrigation systems.  The 1980 Concluding Report provided no specific economic justification for abandoning the Ute Indian Unit.

148.    The United States has breached its fiduciary duty to protect and preserve the remaining portion of the Tribe's Reserved Water Rights by failing to seek and secure a federal court decree that recognizes the remaining quantified Reserved Water Rights that were acknowledged by agreement by the parties to the 1965 Deferral Agreement.

149.    The United States' "full and complete recognition" the Tribe's Groups 1-7 water rights under the 1965 Deferral Agreement, "without resort to litigation," is a recognition that the United States' trust duty to manage, protect, preserve, and develop the Tribe's water rights extends to the full scope of the Tribe's Groups 1-7 water rights.  Since the execution of the 1965 Deferral Agreement, if not before, the United States has had a fiduciary obligation to develop the Tribe's non-decreed reserved water rights and to facilitate the Tribe's and tribal members' access to water

and to derive economic benefit from the Tribe's Reserved Water Rights. The United States has taken no steps toward fulfilling these trust obligations.

### iii.    The Central Utah Project Completion Act of 1992 and the Promise of Uinta Basin Replacement Facilities

#### a.    Unjust Compensation for Waiver of Claims

150.    In the face of the United States' continued breach of its fiduciary duty to preserve, protect, and secure water resources for the Tribe, the Tribe was unsuccessful in negotiating a comprehensive water rights settlement between the Tribe, the United States, and the State of Utah that would enable the Tribe to develop its water resources.

151.    In 1992, Congress passed the Central Utah Project Completion Act (P.L. 102-575) ("CUPCA"), and approved a proposed "1990 Revised Ute Water Compact" ("1990 Revised Compact"). One of the key revisions of the proposed 1990 Revised Compact was a provision stating that "the Tribe shall take from the Green River in lieu of other sources the 57,948 acre-foot depletion of water allocable to the Tribe's group 5 lands." This transfer of Group 5 water rights to the Green River was another measure designed to ensure sufficient water supply to support the CUP for the benefit of non-Indians.

152.    Under the 1990 Revised Compact, Congress acknowledged that natural flow is insufficient to meet the irrigation needs of the Tribe's Group 1 Lands, and Congress therefore provided the Tribe with an additional 0.4 acre-feet/per-acre/per-year of stored water to supplement the Tribe's decreed water rights for its Group 1 lands.

153.    The enforceability of the proposed 1990 Compact was made subject to ratification by both the State of Utah and the Ute Tribe. The proposed 1990 Compact failed to adequately protect and preserve the Tribe's water rights and the Tribe's administrative authority over its waters. And for that reason, the Tribe's membership never ratified the 1990 proposed Compact.

In Title V of the CUPCA, Congress acknowledged the United States' failure to fulfill its obligations to the Tribe under the 1965 Deferral Agreement. Congress found that there were "unresolved tribal claims arising out of an agreement dated September 20, 1965, where the Tribe deferred development of a portion of its reserved water rights for 15,242 acres of the Tribe's Group 5 Lands in order to facilitate the construction of the Bonneville Unit of the Central Utah Project." The stated purpose of Title V of the CUPCA was to "(1) quantify the Tribe's reserved water rights; (2) allow increased beneficial use of such water; and (3) put the Tribe in the same economic position it would have enjoyed had the features contemplated by the September 20, 1965 Agreement been constructed."

154.    In Title V, Congress established a mechanism for compensating the Tribe, in part, for the Federal Government's failure to construct the promised storage facilities that were intended to store Indian water and to develop the Tribe's waters that were scheduled for development through CUP facilities. Section 502(a) of the CUPCA, titled "Bonneville Unit Tribal Credits," stated that

> the Tribe shall receive from the United States 26 percent of the annual Bonneville Unit municipal and industrial capital repayment obligation attributable to thirty-five thousand five hundred acre-feet of water, which represents a portion of the Tribe's water rights that were to be supplied by storage from the Central Utah Project, but will not be supplied because the Upalco and Uintah units are not to be constructed.

155.    The primary objective of the Upalco and Uinta Units for the Tribe was to provide supplemental and full service irrigation water in the Lake Fork and Uinta River Basins, respectively. The amount of compensation provided to the Tribe under this framework is approximately $2 million per year.

156.    The compensation provided to the Tribe pursuant to Section 502(a) was miscalculated and failed to "put the Tribe in the same economic position it would have enjoyed

had the features contemplated by the September 20, 1965, Agreement been constructed."   In calculating the Tribe's compensation for the United States' failure to provide the promised tribal storage, Congress based the calculation on only 35,500 acre-feet of planned tribal storage in the Uintah and Upalco Units.  The United States did not include and account for 8,380 acres of Group 5 lands that were also promised to receive full service irrigation from the Lake Fork River using storage from the Upalco Unit.  Because the United States failed to account for the storage that would provide for full service irrigation to these 8,380 acres of irrigable tribal lands, the compensation provided to the Tribe was miscalculated, and should have been calculated based on a total value of over 63,000 acre-feet of stored water that would have been made available from storage in the Uintah and Upalco Units for the Tribe.

157.   Congress also intended for Title V of the CUPCA to compensate the Tribe for other economic damages it had suffered as a result of the United States' failure to fulfill its promises to the Tribe under the 1965 Deferral Agreement.   Sections 504, 505, and 506 of the CUPCA mandated that federal funds be paid to compensate the Tribe, as well as other promises.

158.   Section 504 required the United States to pay $45 million for the development of a tribal farm and for improvements to existing UIIP facilities.

159.   Section 505 required the United States to pay $28.5 million for various improvements to reservoirs, stream habitat, and municipal water facilities for the Tribe.  Of this $28.5 million sum, $500,000 was directed to be used toward cleanup of the contaminated Bottle Hollow Reservoir, an off-stream reservoir located within the tribal reservation and built as part of the CUP.  Title V, Section 505, obligated the United States to "secure minimum flow of water to the [Bottle Hollow] reservoir to make it a suitable habitat for a cold water fishery."   The United States has never secured such a minimum flow of water to Bottle Hollow, but has left the reservoir

to be supplied by return flow from Tribal Group 1 irrigation water rights, ruining the reservoir as a cold water fishery.   Under these conditions, the Bottle Hollow reservoir cannot function as a cold water fishery for the Tribe and its members.  Bottle Hollow reservoir was intended to be one source of mitigation by BOR for the environmental losses the Tribe incurred from the construction of the CUP.  The United States has violated the Congressional mandate of Title V, Section 505.  Although funds were appropriated for the United States to clean the contaminated Bottle Hollow Reservoir and to secure minimum flow thereto, the United States has never secured a tribal right to the water stored in the Bottle Hollow Reservoir.  Absent an additional, recognized the Tribe's water right for stored water in the Bottle Hollow Reservoir, "compensation" in the form of revitalizing the Bottle Hollow Reservoir is incomplete, and the United States has violated its obligations to the Tribe under Title V.

160.    Section 506 required the United States to pay $125 million to support a tribal economic development fund.  The purpose of the funds mandated under Sections 504, 505, and 506 was to compensate the Tribe for the economic losses the Tribe had suffered as a result of deferring the development of its Group 5 lands, as well as the United States' failure to "mitigate for losses to fish, wildlife, and recreation upon the lands of the Tribe…caused by the construction and/or operation of the Central Utah Project," as was promised in the 1965 Deferral Agreement.

161.    Section 507 of Title V of CUPCA provided that, upon receipt of the funds outlined in Section 504, 505, and 506, the Tribe would be required to waive it claims arising from the United States' failure to construct the Uintah, Upalco, and Ute Indian Units as contemplated in the 1965 Deferral Agreement.  Section 507 further provided that "[n]othing in this waiver of claims shall prevent the Tribe from enforcing rights granted to it under this Act or under the [1990] Compact."

162.    As with the Bonneville Unit Tribal Credits in Section 502(a), the United States failed to account for all facts necessary to constitute just compensation for the Tribe in Section 504, 505, and 506.  Paragraph 5 of the 1965 Deferral Agreement, quoted above, made clear that if the ultimate phase projects were not constructed, including the Ute Indian Unit, then an equitable adjustment would be made sufficient to allow the Tribe to use its Reserved Water Rights to develop its practicably irrigable acreage.  No equitable adjustment has been made.  The United States was obligated, as an equitable adjustment, to pursue substitute projects for the Tribe to be able to use the full scope of its Reserved Water Rights.  The Settlement provided monetary benefits to the Tribe that were less than the amount of money needed to provide for such projects, or to provide substitute benefits to the Tribe.

163.    Further, the compensation that was provided to the Tribe in exchange for its "waiver" of claims under Section 507 was based on the assumption that the 1990 Revised Compact would be ratified by the Tribe and the State of Utah.  However, neither the Tribe nor the State of Utah has ratified the 1990 Revised Compact.

b.    Uintah Basin Replacement Projects

164.    The CUPCA altered the course of development of the CUP facilities that were planned to benefit the Ute Tribe.  The Ute Indian Unit, promised to the Tribe and understood by the Tribe as the most beneficial storage unit to be included in the CUP facilities for the Tribe, and one of the reasons the Tribe agreed to the 1965 Deferral Agreement, was never built to provide supplemental waters to the Bonneville, Upalco, and Uintah Units for the benefit of the Tribe.  Instead, in CUPCA, Congress promised the development of "replacement projects" intended to satisfy the promise to provide some storage to the Tribe for its water rights.

165.    In Title II of the CUPCA, Congress addressed the water storage needs in the Uinta Basin, including the Tribe's water storage needs, by authorizing the development of a series of

canals and storage facilities to "increase efficiency, enhance beneficial uses, and achieve greater water conservation within the Uinta Basin." This was referred to in the CUPCA as the Uinta Basin Replacement Project.

166.   Continued funding for the Uinta Basin Replacement Project was subject to the condition set forth in Section 201(c) of the CUPCA, which stated that funding for the Uinta Basin Replacement Project, as well any other component of the CUP, would terminate five years after the enactment of the CUPCA unless "(1) the Secretary executes a cost-sharing agreement with the District for construction of such project, and (2) the Secretary has requested, or the Congress has appropriated, construction funds for such project."

167.   On information and belief, on August 11, 1993, in order to satisfy the conditions to funding set forth in Section 201(c) of the CUPCA, the Department of Interior entered into an Agreement with the Central Utah Water Conservancy District "For the Sharing of Costs Pursuant to Section 204 of the Central Utah Project Completion Act" ("1993 Cost-Sharing Agreement"). The Explanatory Recitals of the 1993 Cost-Sharing Agreement stated:

> Whereas, the Act amends the Act of April 11, 1956 (Pub. L. 84-485, 70 Stat. 105) to authorize additional appropriations for the completion of certain features of the Central Utah Project; and

> Whereas, Congress anticipates that the District will explore less costly replacement features for the Uintah and Upalco Units of the Central Utah Project which will prove more feasible and environmentally less damaging than features originally planned by the Bureau of Reclamation; and,

> Whereas, *the Secretary is required to ensure that replacement features planned, designed and constructed for the Uintah and Upalco Units of the Central Utah Project are consistent with the Secretary's trust responsibilities to the Ute Indian Tribe*; and

> Whereas under the Act, the Secretary is directed to retain responsibility for implementing the Act, and is authorized, under certain conditions, to contract with the District to plan, design, and construct certain features authorized in the Act.

(emphasis added).

168.    "Replacement features" were defined in the Agreement to "mean Project features planned, designed, or constructed for the Uintah and Upalco Units of the Central Utah Project that were not originally planned, designed, or constructed by the Bureau of Reclamation and that are not identified in Section 203 of the Act."

169.    Through both the CUPCA and the 1993 Cost-Sharing Agreement, the United States acknowledged the United States' continuing trust obligation to supply waters necessary to fulfill the Tribe's water rights through the CUP.  Yet, once again, the United States failed to meet its fiduciary duty to procure, preserve and protect the Tribe's right to use and develop its water rights.

170.    The replacement projects, as formulated by the United States and the Central Utah Water Conservancy District throughout the 1990s, were designed to disproportionately allocate the benefits of the Central Utah Project to non-Indians and the burdens to the Tribe and its members.  By way of example, the United States and the Central Utah Water Conservancy District planned for a reservoir that would be situated entirely on tribal lands, but with roughly half the stored water stored for non-Indians.

171.    Ultimately, the Uintah Basin Replacement Projects entailed both (*i*) stunningly disproportionate losses to the Ute Tribe, and (*ii*) stunningly dismal benefits to the Tribe.  Not only has the United States abandoned the Ute Tribe, it has also abandoned the Federal Government's effort to secure storage and related water works for the Tribe to use in developing and irrigating its irrigable lands with the reserved water rights recognized by the United States in the 1965 Deferral Agreement.  Today, as the CUP nears completion, a sad and tragic irony has unfolded that should escape no one's attention:  the Ute Indian Tribe, whose permanent home is in the Uinta Basin, has no storage facility and related water works from which to supply its reserved water

rights to its irrigable trust lands.  At the same time, the construction of water storage facilities that will benefit non-Indian water users in the Uinta Basin is nearing completion.

## VI.   STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Breach of Statutory and Common Law Trust and Fiduciary Duties:
Mismanagement of Tribal Statutory and Reserved Water Rights to Irrigate
Uintah Indian Irrigation Project Lands and for Other Purposes)

172.    The Ute Indian Tribe incorporates by reference and repeats the allegations of Paragraphs 1 - 171 of this Complaint.

173.    The Act of 1899 imposes statutory and fiduciary duties upon the United States to (*i*) preserve and protect the Ute Tribe's "paramount rights" to the waters flowing through the Tribe's Reservation; (*ii*) "to secure" to the Ute Indians "the quantity of water needed for their present and prospective" needs; and (*iii*) to "otherwise protect the rights and interests of" the Ute Indians.

174.    Further, the Winters Doctrine recognizes as tribal trust property the waters flowing through, under, and on the Reservation, and under the Winters Doctrine and the additional statutes, regulations, common law, and other federal regulations and requirements referred to herein, including those particular to the Ute Tribe, there exists a trust corpus of Reserved Water Rights that is more than a "bare trust;" further, there is imposed on the United States specific common law and statutory duties of a trustee to act reasonably to preserve and protect the tribal trust property, and finally, the Ute Indians' beneficial interest in the trust corpus is a substantive property and trust interest that is subject to enforcement through claims for monetary damages.

175.    Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States,

at all times relevant, has had statutory and fiduciary duties to ensure that all lands within the UIIP receive irrigation water.

176.    Only a portion of the Reservation trust lands have been or continue to be irrigated, reducing crop yields for the Tribe and its members, and significantly impacting the economy of the Reservation.

177.    The Tribe has relied on the UIIP as the exclusive means of delivering irrigation water to develop and sustain agriculture on the approximately 88,000 acres of Reservation land the UIIP was designed to serve.

178.    In failing to sustain a UIIP capable of irrigating the full amount of Reservation lands the UIIP was designed to serve, the United States has violated its statutory and trust responsibilities toward the Tribe as it relates to the UIIP in particular and the Tribe's water rights and water resources in general.

179.    The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through to the present.

180.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

181.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise have occurred.

## SECOND CLAIM FOR RELIEF
**(Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Construct Storage for the Tribe's Federally-Decreed Reserved Water Rights)**

182.    The Ute Indian Tribe realleges Paragraphs 1-181 and incorporates them by reference.

183.    The United States has had, and continues to have, pervasive and comprehensive control through its administration, operation, and regulation of the UIIP since the UIIP's Congressional authorization in 1906; yet in more than a century since the UIIP's Congressional authorization, the United States has failed to construct storage facilities to preserve and protect the Tribe's Reserved Water Rights under the UIIP.  Instead, the United States has willfully and knowingly allowed the Tribe's Reserved Water Rights to flow through the Reservation unused by the Tribe and its members, with the result that these tribal waters are instead being used by non-Indians, to the detriment and economic loss of the Tribe and its members.

184.    The United States has known and continues to know that without the storage of the Tribe's water under the UIIP, the Tribe and its members cannot successfully develop the agricultural trust lands of the Reservation as a permanent homeland for the Ute Indians.

185.    Without storage for its federally-decreed Reserved Water Rights, the Tribe lacks a fully functional irrigation project capable of delivering water to UIIP lands, including trust lands, throughout the crop growing season when the rivers' natural flow is insufficient to deliver the water necessary to engage in economically beneficial agricultural activities.

186.    Without providing for storage of the Tribe's federally-decreed Reserved Water Rights, the United States has engaged in and continues to engage in administrative malfeasance and mismanagement and regulation of the Tribe's Reserved Water Rights, a trust asset, resulting in significant loss and waste of a critical tribal trust asset, all of which frustrates the necessary, expected, and customary development and use of the Tribe's Reserved Water Rights under the UIIP.

187.    Pursuant to the rights and duties established in the statutes, regulations, agreements, common law, and other sources of law identified herein, and pursuant to the United States'

pervasive control over the UIIP and the Tribe's Reserved Water Rights and resources, the United States, at all times relevant, has breached its statutory and fiduciary duties to provide for the development of an Indian irrigation project that includes storage for the Tribe's trust waters.

188.    By its actions and inactions, and in spite of its pervasive and comprehensive control over the management of the Tribe's Reserved Water Rights under the UIIP, the United States has egregiously failed to fulfill its fiduciary duties under statutory and common laws, and other sources of law identified herein, to preserve and protect the waters of the streams of the Reservation for the benefit of the Ute Tribe and its members, thereby wasting a precious tribal trust asset that is absolutely essential to the successful establishment of a homeland for the Ute Indians through agricultural pursuits and for other needs.

189.    The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

190.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

191.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise have occurred.

### THIRD CLAIM FOR RELIEF
**(Breach of Statutory and Common Law Trust and Fiduciary Duties: Failure to Protect, Maintain, Repair, Rehabilitate, Construct, and Preserve the Uintah Indian Irrigation Project)**

192.    The Ute Indian Tribe realleges Paragraphs 1-191 and incorporates them by reference.

193.    The Uintah Indian Irrigation Project is a tribal trust asset that is held for the use and benefit of the Tribe and its allottees and their successors, to be constructed and operated to satisfy,

in part, the statutory and common law duties of the Secretary to preserve and protect the paramount rights of the Tribe and its members and to fulfill their current and future agricultural and domestic needs.  In numerous cases the Project works have been destroyed and are unable to deliver water to the farm headgate for lands designated to receive water under the UIIP.  The United States has failed to adequately maintain the UIIP, resulting in the UIIP falling into a grievous state of disrepair to the detriment of the Tribe and its members.

194.    As a result of this grievous state of disrepair, the UIIP is incapable of supplying the full amount of water that should be available to lands within the UIIP.  The poor conditions of the UIIP have also led to UIIP lands being designated temporarily non-assessable or permanently non-assessable, further reducing the amount of irrigable acreage that is assessed annual operation and maintenance fees, and thereby, in turn, further reducing the amount of funds that are collected each year for operating and maintaining the irrigation works of the UIIP.

195.    Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States has, at all times relevant, had a fiduciary obligation to maintain the UIIP to enable the efficient delivery of available Tribal water to irrigable lands and to the prevent waste of the Tribe's water.

196.    The United States' continuous failure to adequately maintain the UIIP is a violation of the United States' trust responsibility toward the Tribe as it relates to the UIIP specifically, and the Tribe's water rights and water resources in general.

197.    Further, the United States' expenditure of operation and maintenance fees to the disproportionate benefit of non-Indian landowners within the UIIP constitutes a violation of the

United States' trust responsibility toward the Tribe since it is the Tribe that, pursuant to the Act of 1899, is supposed to have the "paramount rights" to the waters that flow through the Reservation.

198.     The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

199.     The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

200.     All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise have occurred.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Statutory and Common Law Trust and Fiduciary Duties:**
**Non-Assessable Lands in the UIIP)**

201.     The Ute Indian Tribe realleges Paragraphs 1-200 and incorporates them by reference.

202.     Since the construction of the UIIP, the United States has designated a substantial portion of the acreage that the UIIP was designed to irrigate as either temporarily non-assessable or permanently non-assessable.  Lands so designated are either temporarily or permanently unable to be irrigated through the UIIP.

203.     A a substantial portion of these land designations were not justified, either because (*i*) the basis for the designation was a condition that could easily have been repaired, or (*ii*) the reason why lands were rendered non-assessable is directly attributable to the BIA's inexcusable failure to adequately maintain the UIIP.

204.     Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and

comprehensive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant, has had a fiduciary obligation to maintain the UIIP to enable the efficient delivery of available Tribal water to irrigable lands and to prevent the waste of tribal water.

205.    The United States' failure to properly manage the UIIP and UIIP Lands, so as to prevent UIIP Lands from becoming temporarily or permanently non-assessable, is a breach of the United States' trust responsibility toward the Tribe as it relates to the management of the UIIP specifically, and the Tribe's water rights and water resources in general.

206.    The non-assessability of UIIP Lands has reduced the number of irrigated acres under the UIIP, resulting in economic losses to the Tribe and its members.

207.    The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

208.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

209.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise have occurred.

## FIFTH CLAIM FOR RELIEF
### (Breach of Statutory and Common Law Trust and Fiduciary Duties – Unlawful Transfers of Tribal Water Rights under the 1941 Act)

210.    The Ute Indian Tribe realleges Paragraphs 1-209 and incorporates them by reference.

211.    Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant,

has had a money-mandating fiduciary obligation to exercise its administrative authority with undivided loyalty to the Tribe and its members, and in a manner that prevents loss of the Tribe's Reserved Water Rights.

212.    The 1941 Act authorized the Secretary of the Interior to transfer UIIP water rights to other Indian-owned lands within the UIIP in order to maximize the economic efficiency of the UIIP.  Since enactment of the 1941 Act, the Tribe and its members have had to rely on the Secretary to exercise his authority under the Act in a manner that is consistent with the United States' trust obligations.

213.    Under color of the 1941 Act, the Secretary has transferred a substantial quantity of the Tribe's Reserved Water Rights to lands outside of the UIIP; indeed, the Secretary has even transferred the Tribe's Reserved Water Rights to lands that were homesteaded by non-Indians and are no longer part of the Tribe's Reservation.

214.    Further, the Secretary continues to recognize such unlawful transfers that took place under the color of the 1941 Act.

215.    The Secretary's unlawful transfers under the color of the 1941 Act and continued recognition of these transfers constitute breaches of the United States' trust responsibility toward the Tribe and its members.

216.    The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

217.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

218.     All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise have occurred.

### SIXTH CLAIM FOR RELIEF
**(Breach of Statutory and Common Law Trust and Fiduciary Duties:**
**Midview Exchange)**

219.     The Ute Indian Tribe realleges Paragraphs 1-218 and incorporates them by reference.

220.     Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant, has had a fiduciary obligation to manage the Tribe's water rights in such a manner as to prevent or minimize losses to the Tribe's water rights and resources and to exercise care, prudence, and loyalty in the administration of these tribal trust assets.

221.     As part of the Midview Exchange, the Tribe was promised beneficial ownership of the right, title, and interest in the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with all facilities and property appurtenant thereto.  This transfer never happened.

222.     As a result of the Midview Exchange—an Exchange that contributes to the United States' pervasive, comprehensive, and exclusive control over the UIIP and the Tribe's water rights and resources—the Tribe has relied upon the United States to effectuate a transfer of the Midview Property.

223.     The United States' failure to transfer the Midview Property has diminished the water-storage capacity that was anticipated and relied upon by the Tribe.  It has also reduced the

amount of water available to the Tribe to use for irrigation, marketing, and other economically productive purposes.

224.    The United States has also failed to property recognize the Tribe's beneficial ownership of the Midview Property as demonstrated, *inter alia*, by its granting rights-of-way to Duchesne County for the Victory Pipeline notwithstanding adverse impacts on the Tribe's property interests established under the Midview Exchange and without obtaining either tribal consent or fair compensation for the rights-of-way.

225.    The United States' failure to effectuate a legal transfer of the Midview Property and failure to recognize the Tribe's beneficial ownership of the Midview Property constitute breaches of the United States' trust responsibility toward the Tribe as it relates to the UIIP specifically and the Tribe's water rights and water resources in general.

226.    The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

227.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

228.    All conditions precedent to the initiation and maintenance of this action have been satisfied or have otherwise occurred.

**SEVENTH CLAIM FOR RELIEF**
**(Breach of Statutory and Common Law Trust and Fiduciary Duties: Midview Exchange – Failure to Discontinue Inequitable Water Management Framework)**

229.    The Ute Indian Tribe realleges Paragraphs 1-228 and incorporates them by reference.

230.     Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant, has had a fiduciary obligation to manage the Tribe's water rights in such manner as to prevent or minimize losses to the Tribe's water rights and resources and to exercise care, prudence, and loyalty in the administration of these tribal trust assets.

231.     The Midview Exchange provided for an encumbrance on the Tribe's federally-decreed water rights for an indefinite period of time.  Because congressional authorization was never provided for the Midview Exchange, the Midview Exchange has always been, and remains today, an illegal conveyance of tribal trust assets under 25 U.S.C. 177.

232.     Pursuant to Section 177, the Midview Exchange can, at most, function as a non-binding arrangement for managing the Tribe's water and the UIIP.

233.     Upon the Midview Exchange becoming inequitable to the Tribe, the United States was obligated to rectify this inequity, whether by formally nullifying the Midview Exchange or by negotiating a new water transfer scheme that is equitable and beneficial to the Tribe.

234.     The United States' failure to rectify the inequities of the Midview Exchange constitutes a violation of the United States' trust responsibility has toward the Tribe and its members.

235.     The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

236.     The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

237.   All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

## EIGHTH CLAIM FOR RELIEF
**(Breach of Statutory and Common Law Trust and Fiduciary Duties:
Failure to Develop Tribal Water Rights)**

238.   The Ute Indian Tribe realleges Paragraphs 1-237 and incorporates them by reference.

239.   Pursuant to the 1965 Deferral Agreement, the United States agreed to the "full and complete recognition" of the Tribe's water rights as identified in Groups 1-7 of the Decker Report "without resort to litigation."  This provision gave further definition to the United States' fiduciary duties as they relate to the Tribe's "paramount" rights to water resources throughout the Reservation.  Specifically, by agreeing to the "full and complete recognition" of the Tribe's non-decreed water rights detailed in the Decker Report "without resort to litigation," the United States acknowledged that it has a fiduciary duty to ensure and secure the legal recognition for the development and use of all the Reserved Water Rights for Groups 1-7 in order to ensure that the present and future needs of the Tribe are met.

240.   The United States has failed to develop the Tribe's water rights outside of the UIIP as identified in the Decker Report, an omission that is inconsistent with the United States' commitment to the "full and complete" recognition of said water rights.

241.   The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

242.   The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

243.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

### NINTH CLAIM FOR RELIEF
**(Breach of Statutory and Common Law Trust and Fiduciary Duties:**
**Failure to Enforce and Protect the Tribe's Right to Just Compensation in the 1992**
**CUPCA)**

244.    The Ute Indian Tribe realleges Paragraphs 1-243 and incorporates them by reference.

245.    Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant, has had a fiduciary obligation to manage and administer the Tribe's water rights and water resources with prudence and undivided loyalty.

246.    The compensation scheme for the Tribe that was ultimately enacted under Title V of the CUPCA was the culmination of a series of long and involved communications and negotiations among interested parties.

247.    Throughout the course of these communications and negotiations leading to the enactment of the CUPCA, the United States had a fiduciary obligation to represent the interests of the Tribe in bringing to Congress a proposed compensation package that would justly compensate the Tribe for the United States' failure to construct the promised water storage units in the 1965 Deferral Agreement.

248.    The United States failed to satisfy this trust obligation, resulting in a Congressional compensation scheme that failed to account for the entire harm the Tribe had incurred as a result of the United States' failure to construct the agreed-upon water storage units.

249.     The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

250.     The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

251.     All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise have occurred.

### TENTH CLAIM FOR RELIEF
### (Breach of Statutory and Common Law Trust and Fiduciary Duties:
### Failure to Provide Tribal Water Storage as Part of the Uintah Basin Replacement Projects)

252.     The Ute Indian Tribe realleges Paragraphs 1-251 and incorporates them by reference.

253.     The legislative intent behind the 1992 CUPCA was to "put the Tribe in the same economic position it would have enjoyed had the features contemplated by the September 20, 1965 [Deferral] Agreement been constructed."  CUPCA mandated the development of "replacement" systems and facilities to provide necessary tribal storage and supplemental water necessary to meet the Tribe's present and future needs given the United States' failure to satisfy its promises under the 1965 Deferral Agreement.

254.     Through both the CUPCA and the 1993 Cost-Sharing Agreement, the United States acknowledged its continued trust obligation to supply waters necessary to fulfill the Tribe's water rights through the CUP.  Yet, the replacement projects initiated by the 1992 CUPCA were designed and constructed to meet the water needs of non-Indian water users at the expense of the Tribe and its members.

255.     Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant, has had a money-mandating fiduciary obligation to provide for the construction of systems and facilities tailored toward satisfying the water and storage needs of the Tribe and its members.

256.     The United States has breached its fiduciary duties owed to the Tribe and its members by overseeing the development of replacement systems and facilities that were intended to benefit non-Indian water users at the expense of the Tribe and its members, and by failing to ensure that these replacement systems and facilities would provide adequate storage and supplemental water to the Tribe.

257.     The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

258.     The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

259.     All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

## ELEVENTH CLAIM FOR RELIEF
### (Breach of Trust and Fiduciary Duties: Bottle Hollow Reservoir)

260.     The Ute Indian Tribe realleges Paragraphs 1-259 and incorporates them by reference.

261.     Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States,

at all times relevant, has had a money-mandating fiduciary obligation to secure for the benefit of the Tribe a permanent water right to waters stored in the Bottle Hollow Reservoir, and a natural flow right sufficient to enable streamflow storage to maintain a cold water fishery in the Bottle Hollow Reservoir.

262.    The United States has not secured a tribal water right to storage in Bottle Hollow Reservoir, nor has the United States secured a tribal water right to natural flow through the Bottle Hollow Reservoir.

263.    By operating the Bottle Hollow as standing storage instead of streamflow storage, the United States has damaged the Tribe's recreation, wildlife, and fishing needs and has failed to properly mitigate adverse economic impacts the CUP has had on the Tribe.

264.    By failing to secure for the benefit of the Tribe a permanent water right to Bottle Hollow with the qualifications described above, the United States has breached its fiduciary duties to the Tribe and its members.

265.    The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

266.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

267.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

## TWELFTH CLAIM FOR RELIEF
### (Breach of Trust and Fiduciary Duties: Systematic Management and Administration of Tribal Water Rights and Water Resources in Violation of Defendant's Fiduciary Duty of Undivided Loyalty)

268.     The Ute Indian Tribe realleges Paragraphs 1-267 and incorporates them by reference.

269.     Pursuant to the rights and duties established in the statutes, regulations, agreements, and other sources of law identified herein, and pursuant to the United States' pervasive and comprehensive control over the UIIP and the Tribe's water rights and resources, the United States, at all times relevant, has had a money-mandating fiduciary obligation to administer the UIIP and tribal water rights with undivided loyalty to the Tribe and its members.

270.     The United States has engaged in a continuous and systematic practice of managing tribal water rights and the UIIP in a discriminatory manner that has benefited non-Indian water users at the expense of the Tribe and its members.

271.     The United States' discriminatory management of tribal water rights and the UIIP is in direct violation of the United States' (*i*) duty of undivided loyalty to the Tribe and its members, and (*ii*) its statutory duty under the 1899 Act to preserve and protect the Ute Tribe's "paramount rights" to waters flowing through the Tribe's reservation.

272.     The United States' breaches have resulted in substantial, multi-million dollar losses to the Tribe.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

273.     The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

274.     All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

## THIRTEENTH CLAIM FOR RELIEF
### (Unconstitutional Taking of Tribal Assets: Midview Exchange)

275.     The Ute Indian Tribe realleges Paragraphs 1-274 and incorporates them by reference.

276.     As the beneficial owner of its Winters Reserved Water Rights, the Tribe has a cognizable property interest.

277.     Since the execution of the Midview Exchange, the United States, through the Bureau of Reclamation, has deprived the Tribe of a portion of the Tribe's senior-priority Winters Reserved Water Rights in the Lake Fork River Basin and has given those Reserved Water Rights to the Moon Lake Water Users Association.

278.     This action constitutes a per se physical taking of tribal property in contravention of 25 U.S.C. § 177 and the United States Constitution.

279.     What the Tribe received under the Midview Exchange—the right to a portion of the BOR's state-based water rights, with a priority date inferior to the Tribe's *Winters* Reserved Rights and with the prospect of forfeiture through non-use—did not constitute just compensation for the United States' taking of tribal property.

280.     Further, under the Midview Exchange, the water rights in the Duchesne River that were given to the BIA in exchange for the BOR's right to take tribal waters from the Lake Fork River Basin were specifically granted for the beneficial use of the UIIP.  Accordingly, the state-based water rights given to the BIA under the Midview Exchange are more limited in scope than *Winters* reserved water rights.

281.     In addition, due to the BIA's subsequent designations of UIIP Land as temporarily non-assessable or permanently non-assessable, the Tribe is using a lower quantity of water from the Duchesne River than the United States is taking from the Lakefork River Basin.

282.    Finally, the United States has breached the Midview Exchange by failing to transfer the Midview Property to the BIA to become part of the UIIP.

283.    For the foregoing reasons, the Tribe has not received just compensation for the United States' illegal taking of the Tribe's water rights in the Lake Fork River Basin.

284.    The United States' taking is continuing in nature and remains ongoing as of the filing date of this Complaint.

285.    The Tribe is entitled to just compensation for the United States' taking of the Tribe's water rights in the Lake Fork River Basin.

286.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

**FOURTEENTH CLAIM FOR RELIEF**
**(Unconstitutional Taking of Tribal Assets: Central Utah Project Completion Act)**

287.    The Ute Indian Tribe realleges Paragraphs 1-286 and incorporates them by reference.

288.    The Tribe has a cognizable property interest as the beneficial owner of its *Winters* reserved water rights, including the portion that is federally-decreed Reserved Water Rights.

289.    The CUPCA provided for the severe diminution of the Tribe's right to develop its *Winters* reserved water rights and make these water rights valuable for the Tribe and its members, including a mandated "waiver" of the Tribe's right to develop the portion of the Tribe's Group 5 lands that was deferred under the 1965 Deferral Agreement.  The CUPCA, therefore, deprived the Tribe of a cognizable property interest.

290.    The Tribe did not receive just compensation for this deprivation of its property. Viewed in the context of the CUPCA as a whole, this mandated "waiver" was included because the proposed 1990 Revised Compact ratified by Congress under CUPCA requires the Tribe to

"take from the Green River in lieu of other sources the 57,948 acre-foot depletion of water allocable to the Tribe's group 5 lands."  CUPCA was enacted to compliment the 1990 Compact, but the Ute Tribe never ratified the 1990 Compact due to the Compact's failure to protect either the tribal water rights or the Tribe's administrative authority over its tribal water rights.  In an effort to address these inadequacies, the Tribe has engaged in continuous good faith efforts to negotiate a revised Compact with the State of Utah and the United States.  Unfortunately, these efforts have not resulted in the execution of a binding Compact.

291.    Furthermore, the Tribe did not receive adequate compensation in exchange for its mandated waiver through Title V of the CUPCA, for reasons including, but not limited to, the United States' failure to provide compensation sufficient to support development of the full scope of the Tribe's Reserved Water Rights and the failure to account for the Tribe's Croup 5 Reserved Water Rights to be served by the Lake Fork River in calculating the appropriate compensation scheme through the Bonneville Unit Tribal Credits in Section 502(a) of CUPCA.

292.    Based on (*i*) the lack of a Compact securing Tribe's water rights in the Green River and (*ii*) inadequate compensation under Title V of CUPCA, just compensation has not been provided to the Tribe, and the mandated waiver in Section 507 constitutes a regulatory taking in violation of the Fifth Amendment of the United States Constitution.

293.    The United States' taking is continuing in nature and remains ongoing as of the filing date of this Complaint.

294.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

## FIFTEENTH CLAIM FOR RELIEF
### (Breach of Contract: 1965 Deferral Agreement)

295.    The Ute Indian Tribe realleges Paragraphs 1-294 and incorporates them by reference.

296.    Claims that typically sound in tort but that are based entirely on the breach of a duty established in a government contract are considered breach of contract claims for jurisdictional purposes. *Woodbury v. United States*, 313 F.2d 291 (9th Cir. 1963).

297.    In the 1965 Deferral Agreement, the United States agreed to the "full and complete recognition" of the Tribe's Groups 1-7 water rights "without resort to litigation."  The United States further agreed that "all phases of the Central Utah Project will in good faith be diligently pursued to satisfy all Indian water rights at the earliest possible date" after January 1, 2005 (emphasis added).

298.    Through these provisions in the 1965 Deferral Agreement, the parties mutually confirmed that the Tribe was reliant on the United States to implement systems and facilities for the development of all tribal water rights, a term that encompasses Groups 1-7 in their entirety.

299.    The 1965 Deferral Agreement gives rise to a contract-based fiduciary duty to develop the Tribe's water rights for Groups 1-7.  By failing to develop all of the Tribe's water rights, the United States has violated this fiduciary duty, thereby breaching the 1965 Deferral Agreement.

300.    In addition, the United States has failed to satisfy its contractual obligation under the 1965 Deferral Agreement to adjust the diversion point for the Wissiup, Leland, and Ouray School Canals in order to provide safer, less polluted water for the UIIP.  This contractual obligation has in no way been waived or abridged since the execution of the 1965 Deferral Agreement.

301.    The United States' breaches have resulted in substantial economic losses to the Tribe and its members.  The United States is liable in damages for such losses.  Damages are due from the inception of the United States' breaches through the present.

302.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

303.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

## SIXTEENTH CLAIM FOR RELIEF
### (Breach of Contract: Midview Exchange)

304.    The Ute Indian Tribe realleges Paragraphs 1-303 and incorporates them by reference.

305.    To the extent the Midview Exchange is a valid, enforceable agreement, the United States has breached the Midview Exchange by non-performance in failing to effectuate a transfer of the Midview Property in trust for the benefit of the UIIP.

306.    The Tribe did not discover this non-performance until July 2012, when a jurisdictional dispute arose between the Tribal Fish and Wildlife Officers and two Duchesne County Deputy Sheriffs.

307.    The United States' breach has resulted in substantial economic losses to the Tribe and its members.  The United States is liable in damages for such losses.  Damages, including punitive damages, are due from the inception of the United States' breaches through the present.

308.    The United States' breaches are continuing in nature and remain ongoing as of the filing date of this Complaint.

309.    All conditions precedent to the initiation and maintenance of this action have been satisfied or otherwise occurred.

WHEREFORE, THE UTE INDIAN TRIBE REQUESTS:

1.      Monetary damages in an amount to be determined at trial, together with pre- and post-judgment interest based on the United States' breaches of its common law, constitutional, statutory, regulatory, contractual and fiduciary duties to the Tribe.

2.      Declaratory and injunctive relief to the extent necessary or proper to provide the relief otherwise requested.

3.      An award of the costs of suit incurred by the Ute Indian Tribe, including without limitation, attorneys' fees, expenses, expert costs and all other costs related to this action.

4.      Such other and further relief as the Court shall deem just and proper.

Dated: March 7, 2018.


                              FREDERICKS PEEBLES & MORGAN LLP


                              *s/ Frances C. Bassett*
                              Frances C. Bassett, Attorney of Record
                              Thomas W. Fredericks, of Counsel
                              Jeremy J. Patterson, of Counsel
                              Joanne Harmon Curry, of Counsel
                              Michael D. Oeser, of Counsel
                              Michael W. Holditch, of Counsel
                              1900 Plaza Drive
                              Louisville, Colorado 80027
                              Telephone: (303) 673-9600
                              Email: fbassett@ndnlaw.com

                              Rollie E. Wilson, of Counsel
                              FREDERICKS PEEBLES & MORGAN LLP
                              401 9th St., N.W., Suite 700
                              Washington, DC 20004